Meir DUBINSKY, Plaintiff,

v.

The UNITED STATES, Defendant,

and

Daktronics, Inc., Defendant–Intervenor.

No. 98–884C.

United States Court of Federal Claims.

March 31, 1999.[1]

---

1. An unredacted version of this opinion was filed on March 25, 1999 and judgment was entered that same date. It was provided to the Government so that offerors' proprietary information could be redacted prior to public release of the opinion. The opinion did not include a ruling on the quantum of plaintiff's claim for proposal preparation costs. The opinion and judgment of March 25, 1999 are hereby vacated. Today's opinion incorporates the Government's proposed redactions and includes a discussion and ruling on plaintiff's claim for proposal preparation costs. *See infra* Discussion § VII.

Meir Dubinsky, Niles, Illinois, plaintiff pro se.

Katherine A. Barski and Joel McElvain,[2] U.S. Department of Justice, Washington, D.C., with whom were Acting Assistant Attorney General David W. Ogden, Director David M. Cohen, Deputy Director Sharon Y. Eubanks, U.S. Department of Justice, Washington, D.C., for defendant.

Robert E. Hayes and Roberto A. Lange, Sioux Falls, South Dakota, for defendant-intervenor.

## OPINION

BRUGGINK, Judge.

This is a bid protest action challenging a procurement by the United States Air Force ("USAF"). Nu–Way Signs Company ("Nu–Way"), of which Meir Dubinsky, plaintiff pro se, is the sole proprietor, submitted proposals in response to a solicitation issued by the USAF Academy ("Academy") for two electronic scoreboards for the Academy's football stadium in Colorado. After conducting discussions with six offerors and evaluating amended proposals, the agency awarded the contract to Daktronics, Inc. ("Daktronics"). Subsequently, plaintiff filed a protest with the General Accounting Office ("GAO"). Before GAO could issue a decision, however, plaintiff filed this action seeking injunctive relief.

Plaintiff challenges the agency's evaluation of both the awardee's and plaintiff's proposals. The complaint alleges that the Academy improperly determined Daktronics' amended proposal to be technically acceptable and exceeding the solicitation's technical requirements. It also alleges that the agency misevaluated plaintiff's amended proposal by failing to rate it as exceeding several technical requirements. Daktronics intervened in this protest shortly before the evidentiary hearing, which was held on February 9, 1999. Oral argument was heard on February 11, 1999. For the reasons set forth herein and explicated at the oral argument, the defendant's motion for summary judgment is denied and plaintiff's motion for summary judgment is granted.[3]

---

2. Mr. McElvain served as defendant's counsel until January 29, 1999. On February 1, 1999, Ms. Barski was assigned responsibility for this case.

3. After the oral argument, the court entered a summary order granting a permanent injunction

## BACKGROUND [4]

On September 4, 1998,[5] the Academy issued solicitation number F05611–98–R–2293 [6] for two electronic display signs for its football stadium in Colorado. The solicitation, issued as a request for proposals ("RFP") on an unrestricted basis, instructed offerors to submit proposals on or before September 19, 1998. The following language of the RFP is pertinent to the present action:

This is a combined synopsis/solicitation for commercial items prepared in accordance with the format in Federal Acquisition Regulation (FAR) subpart 12.6.... This solicitation ... is issued as a request for proposal (RFP).... Line Item 0001—Provide and install two-(2) electronic display signs (marquees) for Falcon Stadium, United States Air Force Academy, Co. The offeror shall provide all labor, equipment, tools, materials, transportation, and supervision necessary to provide, prepare site, and install electronic display signs. The signs shall function back-to-back for dual viewing.

Admin. R., tab 23 at 4. The RFP included detailed technical requirements for the signs. The following excerpts are relevant to this protest:

Each sign shall be of an LED matrix with an approximate 7–1/2 feet by 15 feet display area .... The electronic display area shall provide for full live video, text and graphics capability. The LED's [sic] shall be of three colors: red, green, and blue, and provide 8 lines of 21 characters per line.... The overall area for each sign shall be a minimum of 10 feet by 20 feet and shall contain side panels to allow customized lettering ... [which] shall be translucent white. The overall color of the signs shall be "Strata blue" .... All computer software needed to program and operate the electronic display configuration shall be provided along with upgrades for the life of the sign ... [and] shall be compatible with a Windows 95 operating system run on a Pentium-based computer. Any applicable software site license(s) shall be provided with the proposal.... A one-year warranty for parts, labor and installation is required for the signs, for all sign

to performance of the prior award to Daktronics. Plaintiff has now filed a "Motion to Stop Resolicitation" informing the court that the agency has resolicited the contract. Plaintiff asks the court to enjoin the resolicitation. The court denies the motion. Nothing in the preliminary order or this opinion preclude the agency from resoliciting. The new solicitation would not be subject to an enforcement proceeding in this proceeding absent some clear violation of the terms of the injunction. See, however, *infra* p. 276.

**4.** The facts are drawn from the following sources: the administrative record filed with the court on December 18, 1998, as later supplemented by the defendant; responses to plaintiff's interrogatories; plaintiff's affidavit; defendant's proposed findings of fact; and the testimony presented at the February 9, 1999 hearing.

**5.** The solicitation appeared on this date on the CBDNet, an online listing of federal government procurements, but did not appear in the print copy of the Commerce Business Daily until September 10, 1998. *See* Commerce Bus. Daily, Sept. 10, 1998, at 29.

**6.** Plaintiff stated the solicitation number as F05611–98–T–2293 in its complaint. Because neither party asserted that the number was material to this dispute, this "fact" was undisputed,

and frankly irrelevant, until oral argument. At oral argument, defendant for the first time asserted that the solicitation number—specifically the letter "T"—supported its argument that the procurement was conducted as a request for quotations ("RFQ"), and thus, by further inference, under simplified acquisition procedures. Defendant, however, failed to identify any support for its assertion, or for the inference that the solicitation was an RFQ. Plaintiff had no opportunity to investigate this contention or respond to this issue because the court issued an order the next day adjudicating the dispute without further briefing. Because the government relied on this "fact" to support its legal argument, and because plaintiff had no opportunity to address defendant's assertion, the court reviewed the factual record to assess the validity of defendant's assertion. As discussed *infra*, the solicitation and contract documents strongly support the view that the solicitation was identified as F05611–98–R–2293, not F05611–98–T–2293. *See infra* text accompanying note 41. The court concludes, based upon defendant's failure to identify support, and the actual lack of support in the record, that no genuine dispute exists with respect to this issue: the solicitation number for this procurement was F05611–98–R–2293. Moreover, because defendant failed to point to any support for its proposed inference regarding the type of solicitation involved here, the precise solicitation number is not a material issue of fact.

hardware/software from [the] time the signs are made fully operational. Repair and operational assistance, above and beyond any warranty work, is required via a toll free number to the manufacturer. This number shall be available from 8:00AM to 5:00PM, Mountain Daylight Time (MDT), Monday through Friday, for the operational life of the sign. The offeror shall identify the offerors [sic] on-site training program and outline specifics. All training will take place on the United States Air Force Academy. At least eight-(8) hours of training shall be provided. Programming and operational training is required for four-(4) individuals. Hardware maintenance training is required for two-(2) individuals.... The contractor shall provide and install the foundation base for the new signs, performing all site preparation, digging, concrete work, landscaping, and electrical installation as required.

*Id.* at 5. The RFP informed offerors that "[t]o be technically acceptable, an offeror shall meet the Government's specifications." *Id.* at 6.

In addition to these technical requirements, the RFP instructed offerors that: (1) *numerous identified FAR clauses governed* the procurement, including FAR 52.212–4, Contract Terms and Conditions—Commercial Items; (2) "[o]fferors must comply with all instructions contained in provision 52.212–1," Instructions to Offerors—Commercial Items, *id.* at 5; and (3) a "*complete copy of* the FAR provision 52.212–3, Offeror Representations and Certifications—Commercial Items, shall be submitted with the offer." [7] *Id.* at 6. Offerors were advised to include their offer price "FOB destination delivery" and a delivery date in their proposals.

With regard to evaluation of proposals and selection of the awardee, the RFP stated:

The Government will award a contract resulting from this solicitation to the responsible offerors [sic] whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered. The following factors, in descending order of importance, shall be used to evaluate offers: 1) Technical Requirements; 2) Delivery Capability; 3) Past Performance; and 4) Price. Technical capability is considered the most important and shall be evaluated against the specifications set forth in this solicitation and specification sheet.... Each proposal shall be evaluated against the solicitation specifications and evaluated as follows: Exceeds solicitation requirements shall receive a (+) rating. Meets the solicitation requirements shall receive a(0) rating. Does not meet the solicitation requirements shall receive a (-) rating. Technical Requirements will then receive an overall score of (+), (0), or (-). Past Performance is considered more important than price. Delivery Capability shall be evaluated against the offerors [sic] proposed delivery as stated in the solicitation. Past Performance will be evaluated to ensure the offeror has performed similar work, with a similar project magnitude for the past five (5) years; satisfactory business practices, timely performance and overall customer satisfaction. Price will be considered as the least important factor. Price will be evaluated to determine its fairness, completeness, and reasonableness as it relates to the items offered.

*Id.* at 5–6.

On September 14, 1998, the Academy issued an amendment to the solicitation which extended the deadline for receipt of proposals until September 22, 1998, and added a new technical requirement: the successful offeror would be required to remove the existing Falcon Stadium marquee prior to installing the new scoreboards.

Six offerors timely submitted proposals, including Daktronics and plaintiff's company, Nu–Way, which submitted three proposals. Daktronics' proposal included attachments specifically addressing the solicitation warranty and training requirements. Daktronics warranty consisted of [ ]

---

**7.** The regulations set out in the 1998 edition of 48 C.F.R. generally governed this procurement. For that reason, all references to the FAR or 48 C.F.R. throughout this opinion refer to the 1998 edition unless otherwise stated.

Daktronics provided separate, though similar, training programs for the maintenance and operator training requirements. For maintenance training, Daktronics offered to provide [ ]. With regard to operator training, it offered: [ ]

Daktronics' proposal and accompanying product literature addressed all but five of the remaining technical requirements.[8] In addition, the technical drawing of the scoreboard, which was included, in part, to demonstrate compliance with the scoreboard display area and overall area specifications, stated that "dimensions are subject to change due to detailed design considerations." Admin.R., tab 12 § 2a.

Daktronics offered to ship the scoreboards [ ] but provided no date for delivery at the Academy. [ ]

Nu–Way's submission included offers based upon three different makes or models of signs. Proposal "A" offered a Daktronics sign; proposals "B" and "C" offered two models of signs manufactured by another company. Regarding technical requirements, plaintiff provided information relating to all of the RFP specifications except the lettering color and software licenses. With regard to warranty, it offered to provide [ ] The training offered by Nu–Way differed according to manufacturer of the sign offered. For the Daktronics sign, Nu–Way

proposed to meet the minimum on-site operator and maintenance training requirements in the RFP; for the other manufacturer, Nu–Way offered to provide [ ]

Nu–Way offered the following delivery times and prices for each of its proposals:[9]

| Proposal | Delivery Time | Price |
|---|---|---|
| "A" | [ ] | $[ ] |
| "B" | [ ] | $[ ] |
| "C" | [ ] | $[ ] |

[ ]

The Academy evaluated the initial proposals at various times between September 22 and 24. The proposals were evaluated with regard to technical requirements by the contracting officer, Michael Wehrmann and, at least for Nu–Way, Coleman Smith.[10] Sgt. Vaccarella alone reviewed the proposals with respect to the three other evaluation criteria (delivery capability, past performance and price).

Technical proposals were evaluated for each of the twenty-two specifications stated in the RFP—for example, the warranty, maintenance training and operator training requirements—and the excavation requirement added by the RFP amendment. These technical requirements were evaluated as twenty-three subfactors of each offeror's

8. The five requirements not addressed were: minimum light intensity of 5000 candelas; software compatibility with Windows 95; provision of software licenses; excavation of the existing sign; and translucent white customized lettering for the signs' side panels.

9. [ ]

10. Although these three officials participated in some form, Mr. Smith's role appears to have been minor. His name appears on only one page of the multitude of evaluation documents in the administrative record: the "evaluation narrative" that accompanies the evaluation sheets for Nu–Way's initial proposal. The administrative record includes only two evaluation sheets for each initial proposal. At the February 9, 1999 evidentiary hearing, Sgt. Vaccarella testified that the second evaluation sheet (i.e., the one not prepared by him) was a collaborative effort by Wehrmann and Smith. He did not explain the reason for this unusual sharing arrangement. The record is clear, however, that only two

names appear on the evaluation sheets of Daktronics and Nu–Way: Vaccarella and Wehrmann.

The court has two additional concerns regarding the scores recorded on the evaluation sheets. First, Wehrmann's evaluation sheets are neither signed nor initialed by him. In fact, Nu–Way's second evaluation sheet does not even identify the evaluator; only the associated one-page narrative bears Wehrmann's name.

Second, Sgt. Vaccarella has altered Wehrmann's evaluation scores. For example, on Wehrmann's evaluation sheet for Nu–Way's initial proposal, Sgt. Vaccarella crossed out a (++) rating for plaintiff's offer to provide [ ], and replaced it with a (+). His initials appear by this revision. No explanation was provided by the government for these alterations despite plaintiff's repeated allegations that these corrections indicated misconduct by the contracting officer. In fact, defendant denied that Sgt. Vaccarella modified any of the other evaluators' scores. *See* Def.'s Resp. Pl.'s Interrog. 19. This

overall technical capability.[11] Contrary to the express language of the RFP, evaluators used a four-tier rating system to rate each subfactor—(+ +), (+), (0), and (-)—rather than the three ratings stated in the RFP. As Sgt. Vaccarella later testified, the (+ +) rating represented a "benefit" to the Academy, i.e., the offeror's feature "not only exceeded the specification, but provided some sort of a benefit." Tr. at 67. The two sets of evaluators' ratings of individual subfactors were not assimilated into a combined score for each initial proposal. Nor was an overall technical rating assigned by any of the evaluators for the initial proposals.

Daktronics initial proposal was found to be deficient in some areas and exceeding the RFP specifications in others. Wehrmann rated the proposal as deficient in five areas,[12] exceeding specifications in three areas,[13] and in line with specifications with regard to the remaining fifteen subfactors. In addition, he marked Daktronics' [ ] as a benefit under the warranty subfactor, in addition to his (+) rating for the overall warranty. Sgt. Vaccarella rated Daktronics' proposal as deficient in six areas,[14] exceeding specifications in the same three areas identified by Wehrmann,

and acceptable with regard to the other fourteen subfactors. Additionally, he awarded Daktronics three benefit ratings: one for warranty [ ]; and two for on-site training (one each for the operational and maintenance training subfactors). The latter ratings were in response to Daktronics' offer to provide [ ] His evaluation narrative also stated that he awarded two (+) ratings for additional features included in Daktronics' proposed operator training program: [ ][15]

Aside from the technical deficiencies discussed above, Sgt. Vaccarella noted several other deficiencies in Daktronics' proposal: (1) it did not include the FAR 52.212–3 representations and certifications; (2) the proposed payment terms required advance payments, which are inconsistent with the mandatory prompt payment term in the RFP;[16] and (3) the submitted past performance data was inadequate.

Because each of Nu–Way's three proposals offered a different make or model of scoreboard, the technical ratings differed for each. The two evaluation sheets for Nu–Way's proposals were identical, with the exception that the ratings for proposal "C" differed with

---

response is plainly incorrect and the court rejects it.

**11.** The RFP did not explicitly use the term "subfactors." However, it did inform offerors that each of the technical specifications listed in the RFP would be evaluated using a (+), (0) and (-) rating system, and that these ratings would be combined to generate an overall rating for the *technical requirements factor.* The evaluation sheets prepared by the agency listed these specifications as twenty-three line items under the "Technical Proposal" evaluation factor. These twenty-three specifications, therefore, constituted evaluation subfactors. The RFP adequately notified offerors that proposals would be evaluated according to these subfactors and that failure to *comply with any one of these subfactors* would render a proposal technically unacceptable. *See* Admin. R., tab 23 at 6.

**12.** Light intensity, computer software upgrades, software compatibility with Windows 95, software licenses, and existing sign excavation.

**13.** [ ]

**14.** The five areas identified by Wehrmann, *see supra* note 12, and toll-free number technical support, which Vaccarella viewed as deficient

because he determined that it was offered "only on weekends." Admin. R., tab 13 at 5.

**15.** At the foot of the narrative sheet, Sgt. Vaccarella tallied the subfactor ratings as follows: 1(+ +), 3(+), 4(-), all others (0). These figures are not consistent with the itemized scores on the three-page proposal evaluation sheet, nor do they correlate with the explanations of ratings in the remainder of the evaluation narrative. Moreover, the scoring on the evaluation sheet differs from that reflected in the narrative. The scores presented in the text above include all (-), (+), or (+ +) ratings identified in either the evaluation sheets or the evaluation narrative.

**16.** The RFP incorporated by reference FAR 52.212–4(i), which states that "[p]ayment shall be made for items accepted by the government that have been delivered to the delivery destinations set forth in this contract." 48 C.F.R. § 52.212–4(i). In addition, FAR 52.232–1, a mandatory clause for fixed-price supply contracts which is incorporated into the contract under the *Christian* doctrine, *cf. General Eng'g & Machine Works v. O'Keefe,* 991 F.2d 775, 780–81 (Fed.Cir.1993) (incorporating a clause that complemented the predecessor to FAR 52.232–1), provides that the "Government shall pay the Contractor ... for supplies delivered and accepted." 48 C.F.R. § 52.232–1.

regard to one subfactor.[17] All three proposals were rated as being deficient (-) with respect to some of the technical subfactors: proposal "A" was found to contain two deficiencies; proposal "B" had four; and proposal "C" had three.[18] Proposals "B" and "C" were found to exceed the solicitation requirements in several areas.[19] Sgt. Vaccarella [ ] and awarded all three proposals a(+) for this item.[20]

On September 23, 1998, Sgt. Vaccarella sent a letter (and an identical e-mail message) to Daktronics informing the company that its proposal was deficient with respect to five of the specifications.[21] No mention was made regarding the non-technical deficiencies regarding representations and certifications, payment terms, and past performance data. The communications asked Daktronics to "correct these deficiencies by submitted [sic] an amended proposal by fax or email," to be received "no later than 25 Sep 98 at 3:00 Mountain Standard Time." Admin. R., tab 14 & tab 15A at 1. It further stated: "The amended proposal shall address the requirements listed above. Failure to do so could result in your company being eliminated from the acquisition." *Id.*

The next day, September 24, the agency completed evaluations of initial proposals.

Sgt. Vaccarella decided to engage the remaining five offerors in discussions, which was a de facto determination of the competitive range.[22] Accordingly, he sent letters to these offerors, informing them of deficiencies identified in their initial proposals and requesting the submission of amended proposals by 3:00 p.m. Mountain Standard Time on September 25. The letter sent to Nu–Way identified four technical deficiencies relating to some or all of Nu–Way's proposals.[23]

A number of other developments occurred on September 24. First, at 9:30 a.m., Sgt. Vaccarella received what is purported to be Daktronics' amended proposal. This proposal consisted of a cover page—signed and dated September 21, 1999 by a Daktronics manager—and a three-page letter and attachments that were identical to a portion of Daktronics' initial proposal. Sgt. Vaccarella considered it to be Daktronics' amended proposal, a position that the defendant asserts in this litigation. *See* Def.'s Resp. Pl.'s Interrog. 4.

Second, at some time after 4:15 p.m., Sgt. Vaccarella received an e-mail message from Daniel Minnaert, Daktronics' college/university regional manager, responding to Vaccarella's message the previous day and address-

---

**17.** *See infra* note 19.

**18.** Both evaluators agreed on these deficiencies. All three proposals failed to meet the RFP requirements for licenses and upgrades for the software required to operate the signs. Proposals "B" and "C" were found not to meet the character size and centering requirement; proposal "B" alone was assessed as not meeting the RFP's minimum display area requirement.

**19.** Proposals "B" and "C" exceeded the minimum requirements for [ ] and for [ ] In addition, proposal "C" exceeded the requirement for [ ]. Regarding the latter, Sgt. Vaccarella rated this feature of proposal "C" as a (+); Wehrmann/Smith rated it as a (+ +). Sgt. Vaccarella's subsequent evaluation summary reveals that he assigned Nu–Way only a (+) rating for this subfactor when he was determining offerors' overall scores for the technical requirements factor. No explanation was given as to whether he overruled Wehrmann/Smith's (+ +) rating or overlooked it.

**20.** The handwritten description of [ ] appears on both evaluation sheets in Sgt. Vaccarella's handwriting. On both sheets, the score was ini-

tially marked as a (+ +), then altered to a (+). Sgt. Vaccarella's initials appear next to both changes.

**21.** The toll-free number technical deficiency identified by Sgt. Vaccarella in his evaluation was not included in this list.

**22.** In its interrogatory responses, defendant asserted that "[t]here was no competitive range determination eliminating offerors from competition after the initial proposal." Def.'s Resp. Pl.'s Interrog. 25. The statement of facts in defendant's brief, however, acknowledged the existence of a competitive range. *See* Def.'s Mot. Summ. J. at 2. Moreover, Sgt. Vaccarella testified that "for lack of a better word," he had established a competitive range. Tr. at 40. This is consistent with his testimony, *see id.* at 39–40, that he elected to follow FAR 15.306(d), which is entitled "Exchanges with offerors after establishment of the competitive range." 48 C.F.R. § 15.306(d).

**23.** One deficiency related solely to proposal "B" and another applied only to proposals "B" and "C". *See supra* note 18 and accompanying text.

ing the five technical deficiencies identified by the agency. Minnaert's e-mail message revised Daktronics' initial proposal with respect to these five items.[24] With regard to Vaccarella's query regarding [ ] Admin. R., tab 15A at 3.

Finally, later in the afternoon, following receipt of Minnaert's e-mail response, Sgt. Vaccarella telephoned him to discuss areas of Daktronics' responses that he found to be problematic. Two memoranda prepared by Sgt. Vaccarella purport to recount the content of this conversation.[25] The first, titled "Final Proposal Revision, 9/24/98 Email @ 4:15," recounts three "concerns" he expressed to Minnaert regarding Daktronics' amended proposal, which needed to be addressed notwithstanding Daktronics' e-mail response: inadequate past performance data; the omission of representations and certifications; and the absence of any software license agreements. The memorandum reveals that Sgt. Vaccarella requested Daktronics to provide information on these matters: "Need past performance information and reps & certs.... I also told Dan I need to see a copy of the license agreement." Admin. R., tab 15A1 at 2. The second memo, also dated September 24, and titled "Additional discussion items concerning the email," reported oral representations made by Minnaert regarding Daktronics' compliance with the training and warranty specifications. According to Sgt. Vaccarella, Daktronics confirmed that: (1) the warranty would commence upon the date the sign be-

came fully operational; and (2) the on-site training offered in the amended proposal [ ]

Four of the other five offerors submitted amended proposals prior to the deadline on September 25.[26] Nu–Way submitted a letter which responded to the four concerns noted by Vaccarella. The letter also amended Nu–Way's three proposals to [ ]

Between September 25 and 27, Sgt. Vaccarella alone evaluated all of the amended proposals. This second round of evaluations consisted only of his reevaluation of the those subfactors which had been found to be deficient in offerors' initial proposals. Sgt. Vaccarella rated all five of Daktronics' revisions as (0). Combining these revised scores with the scores for the other eighteen subfactors carried over from its initial proposal, he determined that the amended proposal warranted an overall technical rating of (+). He prepared a memorandum recording this rating for Daktronics on September 27, 1998. *See* Admin. R., tab 17.

Nu–Way's amended proposals were all found to be technically acceptable: all three proposals received a(0) rating for software licenses and upgrades; proposals "B" and "C" received a (+) rating for [ ]; and all three proposals received a (+) rating for [ ].[27] In addition, Sgt. Vaccarella awarded all three proposals a bonus (+) for the [ ]. Nevertheless, all three proposals received

24. Sgt. Vaccarella permitted offerors to simply address the deficiencies which he had identified; offerors were not required to resubmit those portions of their initial proposals that had been found to be technically acceptable.

25. These two documents were not included in the agency report submitted to GAO, nor were they included in the administrative record initially filed with the court in this action. Instead, the existence of these documents was made known to the court by testimony of Sgt. Vaccarella during the February 9, 1999 evidentiary hearing. Defendant's counsel informed the court that her predecessor, Joel McElvain, excluded these documents from the administrative record, possibly on the basis of a privilege. *See* Tr. at 95–96. The court was neither informed that documents were being withheld, nor that a privilege was being asserted. In fact, the court asked Mr. McElvain on several occasions whether the ad-

ministrative record was complete and on each occasion he replied in the affirmative. No basis for a privilege assertion is apparent to the court. In order to maintain a complete administrative record, the court grants defendant's oral request to include these documents in the administrative record. Nevertheless, the court is concerned about how the matter was handled.

26. One offeror failed to submit an amended proposal. Because its initial offer had been determined to be technically unacceptable, this offeror was not considered for contract award.

27. Sgt. Vaccarella elevated the ratings of proposals "A" and "C" with regard to this subfactor from (0) to (+), even though Nu–Way's submission had not modified the [ ] offered in these proposals. These changes appear to be corrections of prior evaluation errors.

a(0) rating for the overall technical requirements factor. *See* Admin. R., tab 11.

On either September 27 or 28, Sgt. Vaccarella determined that Daktronics' amended proposal was most advantageous to the Academy. On September 28, Sgt. Vaccarella prepared a "Final Proposal Evaluation Summary" ("Summary"), which encapsulated his evaluations of the six offerors' amended proposals and documented his best value determination.[28] The preamble noted that the (++) rating had been used only "[f]or evaluation purposes only . . . to identify a particular technical specification which not only exceeds the standard, but is determined to add a particular benefit to the specification." Admin. R., tab 18 at 1. With regard to the technical requirements factor, the most important of the four evaluation factors, it noted that two offerors had been determined to be technically unacceptable; only one offeror, Daktronics, had received a (+) rating. Consequently, the Summary noted that Daktronics amended proposal "appears to provide the most advantageous offer to the Government. The benefits noted for warranty and training are substantial are [sic] the reason the offer received a (+) for 'Technical Requirements'." *Id.* at 3. Sgt. Vaccarella later testified that he did not add up the number of (+) or (++) subfactor ratings achieved by each offeror to determine a rating for the technical requirements factor. In fact, it remains unclear how he derived the overall technical rating for each offeror.

The final evaluations of three offerors other than Daktronics and Nu–Way—we will refer to them as Offerors X, Y and Z—are also relevant to this protest. Offeror X, one of the two technically unacceptable offerors, received a benefit for two subfactors—[ ]. *See* Admin. R., tab 18 at 1. Offerors Y and Z, which were found to be technically acceptable, each received a benefit rating for offering to provide the Academy with [ ], as Nu–Way had also proposed. *See id.* at 2–3.[29]

On September 28, Sgt. Vaccarella also sent out letters to the unsuccessful offerors informing them that they had not been selected for award. The letter to Nu–Way incorrectly informed the plaintiff that it had failed to supply the required past performance data (contrary to the Summary and matrix he had prepared that same day). That afternoon, Sgt. Vaccarella received a fax from Daktronics which provided a copy of the software license agreement, additional past performance data, and the mandatory representations and certifications.

On September 29, 1998, after it had been selected as the awardee, Daktronics faxed two replacement pages to Sgt. Vaccarella to correct some of the deficiencies remaining in its September 24 amended proposal. The corrected pages made the following two changes to Daktronics' amended proposal: (1) contract payments would be in accordance with the FAR 52.232–1 Payments clause;[30] and (2) software upgrades would be provided for the life of the signs. These September 29 submissions were incorporated into the contract, which was signed by Sgt. Vaccarella on September 30, 1998.

On October 1, Daktronics faxed two further replacement pages to its amended pro-

---

28. An "Evaluation Status Matrix" attached to the Summary purported to condense all of these scores into tabular form. Unfortunately, it is riddled with errors. For example: (1) it omitted the (++) rating for Daktronics' warranty; (2) it credited Daktronics' with seven (+) ratings, whereas the evaluation sheets and narrative only identified five (+) ratings; (3) only five (+) ratings were shown for Nu–Way, whereas proposals "B" and "C" had received six and seven (+) ratings, respectively; (4) the benefit ratings awarded to Offerors X, Y and Z were omitted; and (5) the entry for Offeror Z failed to mention the (+) rating described in the text of the Summary, but attributed three (+) ratings that had not been mentioned. None of these discrepancies have been explained by the Academy.

29. The evaluation sheets for Offerors X, Y, and Z are not before the court; we have gleaned these benefit ratings from Sgt. Vaccarella's Summary. At the evidentiary hearing, Sgt. Vaccarella testified that any proposal offering to provide [ ] was not a benefit to the agency, and that the award of a (++) rating to Offeror Z "was an error on [his] part." Tr. at 84. Presumably, he also erred in awarding Offeror Y a (++) rating for this same feature.

30. The first sentences of FAR 52.232–1 and 52.212–4(i), the payment clause explicitly incorporated into the contract, are substantively identical. Both provide for payment by the Government only after delivery and acceptance of supplies.

posal to Sgt. Vaccarella: (1) a revised technical drawing which corrected an error in the prior drawing relating to LED colors, but deleted language stating that the sign would be painted Strata blue, one of the RFP requirements; and (2) a corrected statement of Daktronics' maintenance training program.[31] The latter page purported to modify the amended proposal to state that on-site training would be provided for two Academy personnel for eight hours, the minimum quantity required by the RFP. Sgt. Vaccarella incorporated both pages into the September 30 contract.[32]

On October 2, Nu–Way requested a debriefing on the contract award. This debriefing was provided to Nu–Way by means of a five-page letter from Sgt. Vaccarella. The letter stated that the post-award debriefing was provided "[i]n accordance with Federal Acquisition Regulation (FAR) 15.506(d) and (e)." Admin. R., tab 21 at 1. Subsequently, on October 13, Nu–Way filed a bid protest with the GAO. The agency notified Daktronics of the protest and suspended contract performance on October 16, 1998.

In response to plaintiff's protest, on October 29, 1998, Sgt. Vaccarella prepared two documents: a statement of facts and a memorandum of law. These documents were included within the agency report submitted to GAO the following month. Neither document made any reference to the use of simplified acquisition procedures or FAR Part 13 in this procurement. The statement of facts, however, included the following statement: "The solicitation was issued as a Request For Proposal (RFP) ... *using FAR 12 and 15 procedures* ...." Admin. R., tab 2 at 1 (emphasis added). It also identified the second round of discussions as follows: "Final proposal revision requested 23 Sep 98, at 3:00 PM. Final proposal revision request [sic]

due 25 Sep 98, at 3:00 PM." *Id.* A table summarizing the time of receipt of offerors' proposals identified the second round of proposals as "Final Proposal[s]." *Id.* at 5.

On November 18, 1998, plaintiff filed this action. Plaintiff's complaint alleges that the Academy deviated from the evaluation plan announced in the RFP, mis-evaluated Daktronics' and Nu–Way's proposals, improperly determined Daktronics' amended proposal to be technically acceptable and, consequently, should have awarded the contract to Nu–Way, the only technically acceptable proposal. Consistent with its regulations, GAO dismissed Nu–Way's protest on November 19, 1998. *See* 4 C.F.R. § 21.11(b).

An evidentiary hearing was held in Washington, D.C. on February 9, 1999 to develop the factual record. Shortly before the hearing, Daktronics filed a motion to intervene in this action pursuant to Rule 24 of the court's rules. This motion was granted at the evidentiary hearing. Thereafter, Sgt. Vaccarella, the only witness to testify at the hearing, stated that he had conducted the procurement under the simplified acquisition procedures set out in FAR Part 13, as authorized by FAR subpart 12.6, which was invoked in the solicitation. He testified that he had issued the solicitation as an RFP by mistake—he had intended to issue it as a request for quotations ("RFQ"). Although Sgt. Vaccarella acknowledged that he conducted discussions in accordance with FAR 15.306 following the submission of initial proposals, he argued that this action was purely optional because Part 13 allowed him to pick and choose among Part 15 procedures. Accordingly, he rejected the proposition that he had issued a request for final proposal revisions pursuant to FAR 15.307(b) because, he asserted, he had opted not to follow that particular aspect of Part 15 in this procurement.

---

**31.** Defendant asserts that this page was submitted on September 29, prior to execution of the contract, citing one its response to plaintiff's interrogatory number 11. *See* Def.'s Mot. Summ. J. at 3. The interrogatory response, however, states only that a revision regarding *operational* training was submitted on that date. Moreover, the fax transmission header at the top of the replacement maintenance training page, like the header at the top of the revised technical drawing, reveals that the page was transmitted on October 1. At the evidentiary hearing, Sgt. Vaccarella acknowledged that the fax header date identifies the date on which he received a replacement page. *See* Tr. at 114. Accordingly, we reject defendant's assertion that the page was received on September 29.

**32.** When asked about this unusual sequence of events at the evidentiary hearing, Sgt. Vaccarella was unable to provide any explanation.

He contended that the proposals submitted by the six offerors following discussions were simply revised proposals.

With regard to the final evaluation of Daktronics' proposal, Sgt. Vaccarella testified that the document received on September 24 at 9:30 a.m. was the proposal submitted in response to his discussion questions, not the e-mail message transmitted later that day, and the proposal he evaluated as being most advantageous to the Academy. He further testified that he determined this proposal to be technically acceptable, though "unacceptable" for award because of non-technical deficiencies. To "clarify" the unacceptable features of Daktronics' revised proposal, he telephoned Minnaert and asked the company to rectify these problems. According to Sgt. Vaccarella, Minnaert provided oral representations that quelled his concerns, and agreed to amend Daktronics' proposal accordingly prior to contract award. Consequently, he received revisions to Daktronics' proposal and subsequently awarded the contract to Daktronics.

Oral argument was held on February 11, 1999. At the conclusion of the oral argument, the court granted plaintiff's motion for summary judgment, permanently enjoined further performance of the contract, and ruled that plaintiff was entitled to recover proposal preparation costs. The court issued a written order to that effect on February 12, 1999. As stated in that order, this opinion explicates the court's decision to enjoin this procurement.

## DISCUSSION

### I. Jurisdiction and Standard of Review

The court has jurisdiction over this post-award bid protest pursuant to the 1996 amendments to the Tucker Act. *See* 28 U.S.C. § 1491(b)(1) (Supp. II 1996) (codifying amendments introduced by the Alternative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320 § 12(a), 110 Stat. 3870, 3874–75). The amended statute requires this court to apply the standard of review prescribed in section 10(e) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (1994). *See* 28 U.S.C. § 1491(b)(4) (Supp. II 1996). That section authorizes a court to hold unlawful and set aside agency action, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994).

Defendant argued in both its post-hearing brief and at oral argument that plaintiff may not prevail because: (1) the four factors to be considered in determining arbitrary and capricious conduct, which were adopted by the Court of Claims in *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974), apply here; (2) under *Keco,* one of the factors to be considered is whether the government acted in bad faith; and (3) plaintiff failed to allege, let alone prove, that Sgt. Vaccarella conducted this procurement in bad faith.

Although the defendant is correct that bad faith is one of the factors of the *Keco* analysis, its other two assertions are incorrect. Bid-protest actions filed in this court since December 31, 1996 fall within the jurisdiction grafted onto the Tucker Act by the ADRA and must be decided under the APA standard of review. Consequently, the *Keco* test—which enunciates criteria that this court should consider when reviewing a protest in which the protester alleges that the government breached an implied contract to give honest and fair consideration to all bids or proposals—has no direct relevance in the present action. Furthermore, defendant misinterprets the *Keco* standard. Under *Keco,* a protester may establish that the government's actions were arbitrary and capricious by showing that they had no reasonable basis, or that the agency committed a prejudicial violation of procurement law, *without* any showing of bad faith. *See id.* The Federal Circuit has explicitly stated that "there is no requirement or implication in *Keco Industries* that each of the factors must be present in order to establish arbitrary and capricious action by the government." *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988); *see also R.R. Donnelley & Sons, Co. v. United States,* 40 Fed.Cl. 277, 282 (1998). In particular, "the absence of any allegation or evidence of bad faith on the part of the [government] . . . is

not determinative." *Prineville*, 859 F.2d at 911 n. 5. The absence of an allegation of bad faith in plaintiff's complaint, therefore, does not compel the court to grant defendant's motion for summary judgment.

## II. Applicability of Simplified Acquisition Procedures

■ At the February 9, 1999 evidentiary hearing, the defendant, for the first time, contended that this procurement was conducted pursuant to Part 13 simplified acquisition procedures. Prior to that hearing, the defendant had taken the position that the procurement was conducted under Part 15, which sets forth procedures for standard (i.e., non-simplified) negotiated procurements.[33]

If simplified procedures under Part 13 had been utilized, then many of plaintiff's concerns about the conduct of discussions in this procurement would be irrelevant. The simplified acquisition procedures in Part 13 allow contracting officers considerable flexibility in the contract award process. For example, contracting officers are granted wide discretion in the evaluation of offers: "The contracting officer has broad discretion in fashioning suitable evaluation procedures. The procedures prescribed in parts 14 and 15 are not mandatory. At the contracting officer's discretion, one or more, but not necessarily all, of the evaluation procedures in part 14 or 15 may be used." 48 C.F.R. § 13.106–2(b)(1). Contracting officers, however, must utilize an "appropriate combination of the procedures in parts 12, 13, 14, and 15." *Id.* § 13.003(h)(2).

Generally, Part 13 procedures apply to procurements that do not exceed the simplified acquisition threshold, which is currently $100,000. *See id.* §§ 2.101, 13.003(d). In 1997, however, the FAR was amended to incorporate a "test program" under which agencies were authorized to use Part 13 procedures for acquisitions of commercial items in amounts up to $5,000,000 for a three-year period ending on January 1, 2000. *See* 62 Fed.Reg. 262, 266 (1997) (codified at 48 C.F.R. § 13.500). If the procurement was conducted pursuant to Part 15, on the other hand, procedural requirements set out in that subpart were mandatory.

The court holds that the procurement was not conducted as a simplified acquisition. As an alternative holding, assuming arguendo that it was, the Academy improperly failed to notify offerors to that effect.

To support its contention that this procurement was conducted pursuant to simplified acquisition procedures, defendant offered the testimony of Sgt. Vaccarella, who testified that the reference to FAR subpart 12.6 in the RFP indicated that he used Part 13 procedures. In its post-hearing brief, defendant claimed that the solicitation was issued as an RFQ, and attempted to bolster Sgt. Vaccarella's testimony regarding the implications of subpart 12.6 by directing the court to two FAR provisions: FAR 12.203 and 12.603(a). Also, at oral argument, defendant's counsel suggested that the solicitation number and the contract cover page indicate that this procurement was issued as an RFQ and, thus, was conducted pursuant to simplified acquisition procedures. The court finds none of these arguments persuasive.

Sgt. Vaccarella testified that the procurement was a simplified acquisition from the outset; it was merely an oversight on his part that the solicitation was issued as an RFP rather than as an RFQ.[34] He further

---

**33.** Defendant's counsel stated at the hearing that she had been informed by Sgt. Vaccarella of his "use" of simplified acquisition procedures for the first time that preceding weekend, i.e., February 6–7, 1999, and consequently had not been able to brief this issue in defendant's motion for summary judgment filed on February 3. *See* Tr. at 29. Consistent with this statement, defendant's counsel never mentioned that this procurement was conducted as a simplified acquisition—a fact that was potentially significant to the outcome of this case, if true—during the course of five status conferences preceding the evidentiary hearing,

including a status conference as late as February 1, 1999.

**34.** Contrary to the representation in defendant's post-hearing brief, Sgt. Vaccarella did not use the RFQ format in this solicitation. He merely claims now that in September 1998 his "intent" was to use an RFQ rather than an RFP. *See* Tr. at 86. Not only did Sgt. Vaccarella identify this as an RFP in the solicitation itself, and the subsequent solicitation amendment, he also referred to the solicitation as an RFP in his statement of facts and legal memorandum submitted to GAO. *See* Admin. R., tab 1 at 2 & tab 2 at 1.

testified that, as authorized by FAR subpart 12.6, the procurement was conducted under the test program established by subpart 13.5. That subpart encourages agencies to conduct procurements for commercial items in amounts up to $5,000,000 under simplified acquisition procedures. *See* 48 C.F.R. § 13.500. According to Sgt. Vaccarella, because subpart 12.6 authorized use of the FAR subpart 13.5 test program, Part 13 procedures applied and he was able to conduct discussions with only Daktronics after the date for receipt of final proposal revisions.

The only documentation which discusses the procedures followed by Sgt. Vaccarella— his statement of facts submitted to GAO— explicitly states that the solicitation "was issued ... using FAR 12 and 15 procedures." Admin. R., tab 2 at 1. There is no mention of Part 13 or simplified acquisition procedures anywhere in the document. The statement of facts, prepared and signed by Sgt. Vaccarella, directly contradicts his testimony at the February 9 hearing. Moreover, he had every reason to inform GAO of his alleged invocation of simplified acquisition procedures because the broader discretion granted contracting officers under Part 13 would have improved the agency's chances of defeating plaintiff's bid protest. *See Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 600 (Ct.Cl.1980).

Circumstantial evidence also supports the conclusion that the agency's position that this procurement was conducted according to Part 13 is only an afterthought. First, the RFP made no reference to use of simplified acquisition procedures, even though offerors were likely to be unaware of the existence of the temporary, recently-promulgated test program, or its application to this procurement. Nor did it incorporate a statement to

the effect that the procurement was capped at $5,000,000, the ceiling for the simplified acquisition test program. *See* 48 C.F.R. § 13.500(a). Second, there is no documentation in the record of Sgt. Vaccarella's decision to utilize simplified acquisition procedures. This would be remarkable in and of itself, considering that Sgt. Vaccarella was electing to deviate from the standard procedures of Part 15, and might be expected to document his actions as a precaution against potential protests alleging that his conduct of the procurement was noncompliant with Part 15 procedures (which offerors presumably would expect). *Cf. United Marine Int'l LLC*, B–281512, 1999 WL 88941 at *2 (Feb. 22, 1999) (protester alleged noncompliance with Part 15 where offerors were not notified of the use of Part 13 procedures).

The lack of documentation is even more remarkable in light of FAR 13.501, entitled "Special documentation requirements," which states, in pertinent part:

(b) *Contract file documentation.* The contract file *shall* include—

(1) A brief written description of the procedures used in awarding the contract, including the fact that the test procedures in FAR subpart 13.5 were used; ....

48 C.F.R. § 13.501(b) (second emphasis added). The administrative record is bereft of the documentation required by FAR 13.501(b). No explanation was provided for the absence of this mandatory record.[35]

A third item of circumstantial evidence is the manner in which Sgt. Vaccarella conducted the procurement: he appears to have followed, or attempted to follow, Part 15 procedures (which apply generally to all non-simplified negotiated procurements) throughout the procurement. These procedures included: (1) identifying the solicitation as an

---

Although contracting officers are not required to issue simplified acquisition solicitations as RFQs, this appears to be the customary practice of many agencies, including the Academy. *Cf., e.g., West Coast Research Corp.*, B–281359.2, 1999 WL 43513 at *1 (Feb. 1, 1999) (USAF Academy procurement conducted by Sgt. Vaccarella); *APTUS Co.*, B–281289, 1999 WL 95033 at *1 (Jan. 20, 1999) (Dep't of Army); *Environmental Tectonics Corp.*, 98–2 C.P.D. ¶ 140 at 1 (1998) (Dep't of Navy); *Envirodyne Sys.*, 98–1 C.P.D. ¶ 174 at 1 (1998) (Dep't of Interior); *Fluid*

*Power Int'l, Inc.*, 97–2 C.P.D. ¶ 162 at 1 (1997) (NASA); *Forestry Surveys & Data*, 97–2 C.P.D. ¶ 46 at 1 (1997) (Dep't of Agric.).

**35.** As discussed earlier, *see supra* note 25, defendant's counsel on numerous occasions prior to the hearing and during the hearing itself, represented that the administrative record contained all of the documents pertaining to this procurement.

RFP, in accordance with FAR 15.203(a), and referring to offerors' submissions as proposals (rather than quotations) throughout the RFP; (2) incorporating the technical requirements subfactors into the solicitation, and representing their relative weight, as required by FAR 15.203(a)(4) and 15.304(d) (and he even exceeded the latter provision by specifying the rating system for these subfactors); (3) scoring the technical requirements factor and each of the twenty-three underlying subfactors prior to establishing the competitive range, pursuant to FAR 15.306(c); (4) conducting discussions with the six offerors in the competitive range, as required by FAR 15.306(d); (5) requesting written final proposal revisions to be submitted by a common cut-off date, pursuant to FAR 15.307(b); and (6) providing the plaintiff with a post-award debriefing, in accordance with FAR 15.506.[36]

None of these actions were necessary if simplified procedures were utilized. Simplified acquisitions are conducted according to less structured procedures: (1) the standard format for solicitations is the RFQ;[37] (2) there is no requirement to include subfactors or the relative weight of the evaluation factors or subfactors in RFQs, see 48 C.F.R. § 13.106–1(a)(2); (3) scoring of quotations is not required—comparative evaluations of proposals are permitted, see id. § 13.106–2(b)(2); (4) there is no requirement to establish a competitive range or to conduct discussions, see id.; see also West Coast Research, 1999 WL 43513 at *2 (a procurement co-handled by Sgt. Vaccarella); CDS Network Sys., 98–2 C.P.D. ¶ 154 at 3 (1998); and (5) unsuccessful offerors have no right to obtain either pre- or post-award debriefings, see United Marine, 1999 WL 88941 at *4 n.2.

One substantive provision of the solicitation provides further support for the court's conclusion. The RFP incorporated by reference all five clauses specified in FAR 12.301:

four mandatory clauses and 52.212–2, Evaluation—Commercial Items, an optional clause that may be included "[w]hen the use of evaluation factors is appropriate." 48 C.F.R. § 12.301(c). The GAO has stated that FAR 52.212–2 "is to be used when FAR part 15 type procedures are contemplated." United Marine, 1999 WL 88941 at *3. In that case, GAO concluded that the absence of this clause undercut the protester's contention that Part 15 procedures applied to that procurement. See id. Following this rationale, the inclusion of 52.212–2 provides further support for the conclusion that Sgt. Vaccarella was applying Part 15 procedures here.

This conclusion is supported when FAR 12.602(a)—one of the FAR provisions cited by defendant to support its position—is considered. That provision states in part: "When evaluation factors are used, the contracting officer may insert a provision substantially the same as the provision at 52.212–2, Evaluation—Commercial Items, in solicitations for commercial items or comply with the procedures in 13.106 if the acquisition is being made using simplified acquisition procedures." 48 C.F.R. § 12.602(a) (emphasis added). It thus presents a contracting officer with a choice if evaluation factors are incorporated into a solicitation: use FAR clause 52.212–2, or follow the evaluation provision of Part 13 (if Part 13 procedures apply). Sgt. Vaccarella chose to include FAR 52.212–2 in the RFP. That election indicates that simplified procedures were not being used.

As a final piece of circumstantial evidence, the factual report and legal analysis presented by Sgt. Vaccarella in his memorandum of law and statement of facts submitted to GAO suggests that he thought that Part 15, not Part 13, procedures governed the procurement. In response to plaintiff's numerous allegations of improper actions, Sgt. Vaccarella cited to only one FAR provision in parts

---

36. In addition, when he evaluated proposals, Sgt. Vaccarella utilized a four-tier rating system that he had developed, based loosely upon the color rating system established in Appendix BB of the Air Force FAR Supplement ("AFFARS"). Appendix BB implements Part 15 of the FAR. See AFFARS App. BB, §§ BB–100, BB–304(a) (1998).

37. Although the defendant correctly notes that Part 13 does not preclude the use of RFPs, the RFQ appears to be the predominant solicitation format, by far. See supra note 34. As an example, the solicitation prepared by Sgt. Vaccarella in the procurement at issue in West Coast Research took the form of an RFQ. See Commerce Bus. Daily, Sept. 8, 1998, at 44–45.

12, 13 or 15—FAR 15.506—to indicate his compliance with the appropriate regulations. Moreover, in the section of his legal memorandum discussing the level of discretion granted to him under this solicitation, Sgt. Vaccarella made no reference to Part 13 and cited case law interpreting only Part 15.

The sequence of events leading up to Sgt. Vaccarella's testimony at the evidentiary hearing also suggests that the invocation of simplified acquisition procedures in this procurement was an afterthought. Sgt. Vaccarella had been the contracting officer on an Academy procurement for laboratory equipment issued on September 8, 1998 and challenged in *West Coast Research. See* Commerce Bus. Daily, Sept. 8, 1998, at 44–45; *West Coast Research,* 1999 WL 43513. Because the available funding was less than $100,000, that procurement was initiated by an RFQ and conducted pursuant to simplified acquisition procedures. *See West Coast Research,* 1999 WL 43513 at *1–*2. In the course of that procurement, he initiated discussions after the deadline for submission of quotations with a company that had not submitted a quotation. As a result of these discussions, the company submitted a quotation and received the contract award. No discussions were conducted with either of the timely offerors. Nevertheless, the GAO upheld the contract award for the sole reason that the solicitation had been issued as an RFQ under simplified acquisition procedures:

> An RFQ, unlike a request for proposals or an invitation for bids, does not seek offers or bids that can be accepted by the government to form a contract; out Office has raised no objection to agencies seeking and considering revisions to *quotations* submitted any time prior to award.... [W]e see nothing improper in allowing [the awardee] to submit a *quotation* after the closing date.

*Id.* at *3 (citations omitted) (emphasis added).

That GAO decision was issued on February 1, 1999, *see id.* at *1, and a copy was sent to the Academy according to GAO policy. *See* 4 C.F.R. § 21.12(a). On February 4, this court issued a decision directing Sgt. Vaccarella to testify at the upcoming evidentiary hearing. According to Ms. Barski, the Department of Justice attorney then assigned to this case, a few days later (over the weekend of February 6–7) Sgt. Vaccarella for the first time informed her that he had used simplified acquisition procedures in *this* procurement. This explanation for his handling of the procurement was first communicated to the court at the evidentiary hearing on February 9. The sequence of events suggests that Sgt. Vaccarella's eleventh-hour recollection was an attempt to characterize this procurement as a type which the GAO had found unobjectionable in *West Coast Research* just a few days before.

Although perhaps not determinative on its own, the totality of this circumstantial evidence supports Sgt. Vaccarella's assessment in his statement of facts to the GAO that he attempted to follow only the procedures set out in FAR Parts 12 and 15. His testimony to the contrary at the February 9 hearing was less than persuasive.[38] The court concludes, therefore, that Sgt. Vaccarella's testimony does not establish that this procurement was conducted according to Part 13 procedures; rather, it was conducted pursuant to Part 15.

Furthermore, the FAR provisions cited by defendant in its post-hearing brief provide no basis for the court to conclude that Part 13 procedures were either required or utilized in this procurement. FAR 12.602(a) has already been addressed above; the other provision cited—FAR 12.203—states, in pertinent part: "For acquisitions of commercial items exceeding the simplified acquisition

---

**38.** Sgt. Vaccarella contradicted himself on occasion and he was defensive and less than forthcoming. He conceded that Daktronics' revised proposal was "unacceptable" because of numerous problems, including problems relating to technical subfactors (such as maintenance training and warranty), yet refused to acknowledge that the proposal contained technical deficiencies or was technically unacceptable. Likewise, he affirmed his evaluation of Daktronics' revised proposal as being technically acceptable, yet conceded that the document he considered to be the revised proposal was an exact copy of one section of Daktronics' initial proposal, which he had earlier rated as being technically deficient.

threshold but not exceeding $5,000,000, including options, contracting activities shall employ the simplified procedures authorized by subpart 13.5 *to the maximum extent practicable.*" 48 C.F.R. § 12.203 (emphasis added); *see also id.* § 13.500(b). Defendant's reliance on the word "shall" is misguided. At best, this provision requires agencies to make strenuous efforts to utilize the test program. It does not answer the question, however, *of whether simplified acquisition procedures were actually followed in this* procurement. As discussed above, Sgt. Vaccarella's statement of facts represented that he followed Parts 12 and 15 in this procurement, not Part 13, and all of the circumstantial evidence supports that representation. The only direct evidence that Sgt. Vaccarella used the test program is his testimony on February 9, which the court has found to be unsupported.

Defendant also argued in its post-hearing brief that: (1) this solicitation was issued as an RFQ; and, consequently, (2) that the court should follow the GAO's holding in *West Coast Research* because that procurement by the Academy involved similar post-deadline discussions solely with the putative awardee, and the solicitation there was issued as an RFQ and conducted under simplified acquisition procedures. At the subsequent oral argument, defendant asserted two corroborating "facts." The first is an "X" marked in the "RFQ" box in the section of the contract cover sheet identifying the solicitation type. According to defendant, that indicates the solicitation was issued as an RFQ. Several problems exist with respect to the government's reliance upon this check mark on the final contract. First, although the contract was signed by Sgt. Vaccarella on September 30, 1998, that check mark could have been applied at any time prior to the

preparation of the administrative record.[39] Second, that check mark could, consistent with the contracting officer's pattern of errors (admitted or otherwise) throughout this procurement,[40] simply be a mistake. Moreover, this scant evidence is insufficient to rebut the language of the solicitation itself, or Sgt. Vaccarella's representation in his statement of facts to GAO.

The second point raised by defendant at oral argument relates to the inference to be drawn from the solicitation number. Defendant asserts that the use of the letter "T" in the solicitation number shown in the heading of the CBD announcement indicates that the solicitation was an RFQ. The court rejects this argument for two reasons. First, defendant's contention is inaccurate. The defendant is correct that the header to the RFP cited the solicitation number as "F05611–98–T–2293." However, other evidence in the record suggests that reference was a typographical error: (1) the text of the RFP states "[t]his solicitation, F05611–98–R–2293, is issued as a request for proposal," Admin. R., tab 23 at 4; (2) the revised version of the solicitation, which accompanies the September 14, 1998 RFP amendment, uses the "R" identifier in both the heading and the text;[41] and (3) the cover page of the contract also uses the "R" designation, rather than "T." The government has not asserted that the letter "R" in a solicitation number connotes the use of an RFQ format. Consequently, the evidence that this solicitation was an RFP issued pursuant to Part 15 is incontrovertible. Because the holding in *West Coast Research* was predicated upon the distinction between an RFP and an RFQ, defendant's reliance upon that decision is misplaced.[42] Second, no evidence exists in the administrative record, nor did Sgt. Vaccarella testify, that the letter "T" represents that the solici-

**39.** Sgt. Vaccarella did not testify as to when the box under "RFQ" was checked.

**40.** *See* Tr. at 54, 70, 84; *infra* §§ IV.A. IV.B.

**41.** In correspondence and memoranda, Sgt. Vaccarella generally referred to the solicitation using the "T" identifier, though he also used "R" or "Q" on occasions. Daktronics and Nu–Way used both the "R" and "T" identifiers at different times. Clearly, considerable confusion existed

regarding the precise solicitation number. The court chooses to rely on the solicitation, amendment, and contract as the best evidence of the solicitation number.

**42.** The court has misgivings about the holding of *West Coast Research* because it appears to undercut FAR 52.212–1(f), which precludes a contracting officer from accepting late offers. *See infra* note 54.

tation was an RFQ. The court cannot rely on counsel's unsubstantiated assertion at oral argument.

In sum, the court finds that this procurement was not conducted under simplified acquisition procedures; rather, as represented by the agency to GAO, the procurement was conducted pursuant to standard negotiated procurement regulations in Part 15 of the FAR.

Alternatively, assuming arguendo that simplified acquisition procedures were employed, we hold that the agency failed to provide adequate notice of that fact to offerors. The overarching principle codified in the Competition in Contracting Act of 1984 ("CICA"), Pub.L. No. 98–369, Div. B, Title VII, 98 Stat. 1175 is that agencies provide "impartial, fair, and equitable treatment for each contractor." *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1543 (Fed.Cir.1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997). To this end, CICA requires that agencies "shall obtain full and open competition through the use of competitive procedures." 10 U.S.C. § 2304(a)(1)(A) (1994); 41 U.S.C. § 253(a)(1)(A) (1994). As the defendant has correctly observed, simplified acquisitions (including acquisitions for commercial items under the $5,000,000 threshold conducted according to simplified procedures) are exempted from the full and open competition requirement. *See* 10 U.S.C. § 2304(g)(1)(B) (Supp. II 1996); 41 U.S.C. § 253(g)(1)(B) (Supp. II 1996). Nevertheless, the statute directs that agencies, when conducting these procurements, "shall promote competition to the maximum extent practicable." 10 U.S.C. § 2304(g)(3) (1994); 41 U.S.C. § 253(g)(4) (1994); *see also* 48 C.F.R. §§ 13.003(i)(1), 13.104; *CDS Network Sys.*, 98–2 C.P.D. ¶ 154 at 2; *Alpha Executive Servs., Inc.*, 92–1 C.P.D. ¶ 197 at 2 (1992). The FAR does not require explicitly that contracting officers announce whether a procurement is to be conducted pursuant to Part 13. In the court's view, however, making offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition. Providing offerors with notice that a procurement is

being conducted as a simplified acquisition has the secondary benefit of avoiding unnecessary bid protest actions that challenge an agency's failure to comply with Part 15 where the agency, unbeknownst to the protester, was conducting the procurement according to Part 13. The court notes that there has been at least one other such protest recently. *See United Marine*, 1999 WL 88941. These protests—which presumably would not arise if contractors and the Government were reading from the same page—divert the resources of contractors, agencies, and the judiciary.

No mention was made of simplified procedures, Part 13, subpart 13.5, or the test program in the RFP. Offerors were not informed that other than standard negotiated procurement procedures would apply in this procurement. This omission contravenes both the requirement to promote competition mandated by CICA—by failing to put offerors on notice of the rules governing the procurement—and the deeply-ingrained principle that "all procurements, including small purchases, must be conducted consistent with the concern for a fair and equitable competition that is inherent in any procurement." *Cellular One*, 93–1 C.P.D. ¶ 169 at 4 (1993); *see also Environmental Tectonics*, 98–2 C.P.D. ¶ 140 at 4; *General Metals*, 92–1 C.P.D. ¶ 486 at 2.

In most circumstances, offerors would be aware of the use of simplified procedures. For example, the FAR requires, with a few limited exceptions, an agency to set aside solicitations under the $100,000 simplified acquisition threshold exclusively for small business concerns. *See* 48 C.F.R. § 13.003(b)(1). Each solicitation under a small business set-aside must contain provisions and clauses prescribed by Part 19, *see id.* § 13.003(b)(2), which include the applicable small business size standard and product classification, and a clause notifying offerors of the existence of the set-aside. *See id.* §§ 19.501(f), 19.508(c). Offerors are thus made aware that a procurement is being conducted as a total set-aside and, by inference, that simplified acquisition procedures will be used.[43]

---

**43.** Procurements exceeding the $100.000 simpli-

fied acquisition threshold may be conducted as

■ This notice of the proposed use of simplified acquisition procedures is absent where an agency proposes to conduct a procurement for commercial items under the subpart 13.5 test program and the procurement exceeds the simplified acquisition threshold, as was the case here. The absence of a FAR notice provision is especially troubling because the test program, by its very nature, is a temporary phenomenon and offerors are unlikely to be aware of its existence or its invocation by an agency absent notice in the solicitation itself. Because of these concerns, and because the invocation of Part 13 procedures potentially entails a wide departure from standard negotiated procurement procedures, the court holds that an agency must, as a matter of fundamental fairness, inform offerors in the solicitation whether it is invoking the subpart 13.5 test program and simplified acquisition procedures. Failure to do so leaves the procurement subject to challenge on the ground that the lack of notice prejudicially affected the protestor's ability to compete for award.

This simple requirement imposes a minimal burden on agencies, yet yields significant benefits to the procurement community, and the Government. The burden imposed upon an agency is simply to state: (1) that the procurement is being conducted under the subpart 13.5 test program; (2) that simplified acquisition procedures apply; and (3) whether the agency will conduct the procurement according to parts 12, 14 or 15 of the FAR, or some combination thereof. In the event that an agency chooses to utilize a combination of these parts, it must provide notice of which procedural provisions it will apply. The court notes that some agencies already follow such procedures. *See, e.g., Micromass, Inc.,* 98–1 C.P.D. ¶ 93 at 1 (1998) and Commerce Bus. Daily, Dec. 8, 1997, at 23 (noting that the procurement was being solicited in accordance with "FAR Subpart 12.6,

the test program in FAR Subpart 13.6,[44] and FAR Part 15").

■ In the present context, where the solicitation provided offerors with no indication that simplified acquisition procedures would be employed and the mandatory documentation of FAR 13.501 is also absent, the court is obligated to analyze the agency's conduct under the rubric of Part 15.

III. Alleged Improper Negotiations with Daktronics

A. FAR 15.307(b)

The court will address first plaintiff's allegation, subsumed within several allegations in its complaint and raised directly in its request for summary judgment, that the Academy engaged in improper discussions with Daktronics after the submission of amended proposals. Having determined *supra* that this procurement was conducted in accordance with Part 15, the court has no choice but to conclude that the Academy breached FAR 15.307(b). At oral argument, defendant's counsel conceded that, if the procurement was not conducted pursuant to simplified acquisition procedures, the agency's actions violated Part 15. *See* Tr. at 178. The court agrees.

■ Considerable evidence justifies defendant's concession that the agency violated FAR 15.307(b), regardless of whether the request for a second round of proposals is characterized as a request for final proposal revisions or merely as a request for revised proposals. If one accepts Sgt. Vaccarella's characterization in the agency report submitted to GAO that his letters to offerors on September 23 and 24 were requests for final proposal revisions, *see* Admin. R., tab 2 at 1, his conduct of discussions with Daktronics following that request would unquestionably have violated FAR 15.307(b). That provision

---

total set-asides under certain circumstances. *See* 48 C.F.R. § 19.502–2(b). In such an event, a contracting officer is required to include a limitations on subcontracting clause in the solicitation, if the procurement involves supplies, services, or construction. *See id.* § 19.508(e). The presence vel non of this clause, therefore, would inform offerors whether the set-aside falls under simpli-

fied acquisition procedures (in the event that the contracting officer fails to announce this fact).

44. FAR subpart 13.5 was formerly designated as subpart 13.6. *See* 48 C.F.R. subpart 13.6 (1997). It was redesignated as subpart 13.5, effective February 9, 1998. *See* 62 Fed.Reg. 64,916, 64,926 (1997).

states: *"At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision."* 48 C.F.R. § 15.307(b) (emphasis added). Thus, once the request for final proposal revisions has been issued at the conclusion of discussions, it follows that an agency generally may not engage in further discussions with any offerors.[45] *See id.; Cleveland Telecomm. Corp. v. Goldin,* 43 F.3d 655, 659 (Fed.Cir.1994); *Labat–Anderson, Inc. v. United States,* 42 Fed. Cl. 806, 837–838 (1999) (stating that former FAR 15.611(a), a precursor of FAR 15.307(b), precluded discussions after issuance of a request for BAFOs); *see also Data General Corp. v. Johnson,* 78 F.3d 1556, 1561 (Fed. Cir.1996) (stating, prior to the 1997 Part 15 rewrite, that "[o]nce bidders have submitted their BAFOs, the government ... cannot engage in 'discussion' with a particular bidder.");[46] *HFS, Inc.,* 92–2 C.P.D. ¶ 188 at 6 (noting that the "conduct of discussions after receipt of BAFOs with one offeror is generally improper" under former FAR 15.611), *reconsideration denied sub nom. Oakcreek Funding Corp.,* 92–2 C.P.D. ¶ 337 (1992).[47]

Moreover, discussions with one offeror after the issuance of a request for final proposal revisions that enable it to make its proposal technically acceptable—as was the case here—are prohibited. *See Global Assocs. Ltd.,* 96–2 C.P.D. ¶ 100 at 5 (1996) (holding that post-BAFO discussions were improper); *IT Corp.,* 95–1 C.P.D. ¶ 78 at 12 (1995) (same); *HFS, Inc.,* 92–2 C.P.D. ¶ 188 at 6 (same).

The question thus becomes whether Sgt. Vaccarella's exchanges with Daktronics after his September 23 letter and e-mail (requesting the submission of an "amended proposal") constituted discussions. The court concludes that they did. The relevant provision of the FAR is 15.306(d), which states: "Negotiations are exchanges ... between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal.... When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions." 48 C.F.R. § 15.306(d). The exchanges here thus constituted discussions if the agency intended to permit Daktronics to

**45.** The language of FAR 15.611(a) stated the cut-off point for discussions a little more clearly: "Upon completion of discussions, the contracting officer shall issue to all offerors still within the competitive range a request for best and final offers." 48 C.F.R. § 15.611(a) (1996). It is the date of the *request* for final proposal revisions (formerly BAFOs), not the deadline for submission of such proposals, that signals the termination of the discussion period. The quoted excerpts from *Data General* and *HFS* thus understate the period during which discussions are impermissible, but are not inconsistent with either current FAR 15.307(b) or former FAR 15.611(a).

**46.** Part 15 was rewritten and extensively reorganized in 1997. *See* 62 Fed.Reg. 51,224 (1997).

**47.** As an exception to the general rule, a mandatory clause in noncommercial item negotiated procurements directs agencies to consider, and permits them to accept, "a late modification or revision of an otherwise successful proposal that makes its terms more favorable to the Government ... at any time it is received." 48 C.F.R. § 52.215–1(c)(3)(vi). Accordingly, the GAO and courts have permitted agencies to conduct discussions solely with the putative awardee to negotiate a reduction in contract price, provided that the source selection decision was made on the basis of the price submitted in the successful offeror's BAFO. *See, e.g., Prudential–Maryland Joint Venture Co. v. Lehman,* 590 F.Supp. 1390, 1410 (D.D.C.1984); *Space Communications Co.,* 66 Comp. Gen. 2, 9 n.3, 86–2 C.P.D. ¶ 377 at 9 n.3 (1986); *Information Sys. & Networks Corp.,* 86–1 C.P.D. ¶ 30 at 5 (1986). This clause was not incorporated into the solicitation here, nor would it apply if it had been—Daktronics' amended proposal was technically unacceptable and thus was not in line for contract award. *See Robotic Sys. Tech.,* 96–1 C.P.D. ¶ 229 at 3 (1996); *Wilsyk Alaska, Inc.,* 90–2 C.P.D. ¶ 209 at 2–3 (1990).

The GAO has also on occasion permitted post-selection exchanges solely with the putative awardee regarding nonmaterial aspects of an offer where the exchanges neither affected the acceptability of the successful offeror's proposal nor would have affected the selection decision. *See Assets Recovery Sys., Inc.,* 97–1 C.P.D. ¶ 67 at 5 (1997); *Greco Sys.,* 90–1 C.P.D. ¶ 192 at 4 (1990). These decisions are inapplicable here because Sgt. Vaccarella testified that the discussions were necessary to address the technical unacceptability of Daktronics' amended proposal. Generally, however, the GAO has overturned procurements where post-selection discussions have occurred, even where the relative standing of offerors was unaffected. *See SmithKline Beecham Pharm.,* 93–2 C.P.D. ¶ 79 at 4 (1993); *HFS, Inc.,* 92–2 C.P.D. ¶ 188 at 6.

respond by revising its September 24 proposal.

■ Clearly, that test is met here. Sgt. Vaccarella's telephone call to Daktronics on September 24 identified a number of problems in Daktronics' amended proposal, including the absence of mandatory past performance data and representations and certifications, the inclusion of an impermissible payment provision, and Daktronics' failure to state that it would comply with the RFP criteria regarding maintenance training and warranty. He instructed Daktronics to submit information to address each of these concerns. In response to this request, Daktronics faxed documents to Sgt. Vaccarella on September 28 and 29 and October 1, 1998, and he incorporated them into what he considered to be Daktronics' final proposal. It is beyond question that the purpose of Sgt. Vaccarella's telephone call on September 24 was to provide Daktronics an opportunity—unavailable to other offerors—to make its proposal compliant with the RFP. Therefore, these exchanges constituted discussions.

The court is not persuaded by defendant's characterization of the exchanges with Daktronics as "clarifications." First, subsequent to the 1997 rewrite of Part 15, clarifications are defined as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." *Id.* § 15.306(a). Clarifications thus are exchanges conducted in procurements where discussions are not expected to be held; the term has no application to exchanges that occur after discussions have been conducted with offerors. Second, to the extent that defendant's assertion is better characterized as an argument that the ex-

changes between the agency and Daktronics did not rise to the level of discussions, that assertion is contrary to the administrative record and has been addressed and rejected above. Finally, the court notes that an agency's characterization of its actions as "clarifications" is not determinative. *See Hago–Cantu Joint Venture*, 98–2 C.P.D. ¶ 99 at 13 (1998); *IT Corp.*, 95–1 C.P.D. ¶ 78 at 10.[48]

Furthermore, the Academy's violation of FAR 15.307(b) prejudiced plaintiff. Plaintiff's revised proposal was determined by the agency to be technically acceptable; in fact, each of its three proposals exceeded the technical specifications in numerous areas. In contrast, Daktronics' amended proposal was, in fact, technically unacceptable, as Sgt. Vaccarella himself admitted. *See* Tr. at 52, 54–55, 62; *infra* § IV.A. If the agency had not engaged subsequently in improper discussions with Daktronics its proposal would not have been acceptable; therefore, plaintiff would have had a "substantial chance" of contract award. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581–82 (Fed.Cir.1996). Consequently, plaintiff was prejudiced by the agency's violation of FAR 15.307(b). *See Global Assocs.*, 96–2 C.P.D. ¶ 100 at 6–7.

At the evidentiary hearing, defendant presented an alternative argument in an effort to avoid the strictures of FAR 15.307(b). Contrary to his written representations to GAO, Sgt. Vaccarella testified that his request for amended proposals did not constitute a request for final proposal revisions, and thus he did not reach the stage of discussions governed by FAR 15.307(b).

The court has concerns regarding the credibility of Sgt. Vaccarella's eleventh hour re-characterization of his actions. Nevertheless, even if this testimony represented an afterthought, his assessment is arguably le-

---

48. Moreover, the court rejects Sgt. Vaccarella's contention at the evidentiary hearing that the exchanges with Daktronics were not improper because they were unrelated to Daktronics' technically acceptability vel non. First, this argument is based on a false premise—his communications *did* request Daktronics to revise its proposal to comply with two technical criteria (maintenance training and warranty). Second, any exchanges which provide an offeror with an opportunity to revise a material aspect of its proposal constitute discussions, regardless of

whether the revisions address its compliance with technical criteria. *See, e.g., Global Assocs.*, 96–2 C.P.D. ¶ 100 at 5 (holding that post-BAFO exchanges, which were necessary to determine whether an offeror complied with limitations on subcontracting, constituted discussions); *Paramax Sys. Corp.*, 93–2 C.P.D. ¶ 282 at 5–6 (1993) (holding that post-BAFO exchanges to obtain a downward revision of the successful offeror's fee, which exceeded the maximum fee permitted by the RFP, concerned a material term and thus rose to the level of discussions).

gally correct. A request for final proposal revisions must: (1) inform offerors that discussions have been completed; (2) state that offerors are being given a final opportunity to revise their offers; (3) establish a common cut-off date; and (4) require offerors to submit their offers in writing. *See* 48 C.F.R. § 15.307(b), *see also KMS Fusion, Inc.*, 91–1 C.P.D. ¶ 447 at 4 (1991) (holding that a contracting officer's request for submissions constituted a request for BAFOs because it communicated that discussions were closed and established a common cut-off date for final offers); *A.T. Kearney, Inc.*, 90–1 C.P.D. ¶ 305 at 3 (1990) (same). The request for amended proposals issued by Sgt. Vaccarella did not meet the first two of these criteria: it provided no indication that discussions had been completed, or that offerors would not be permitted an opportunity to submit a final proposal revision.[49] Regardless of Sgt. Vaccarella's intent at the time, his actions did not comport with FAR 15.307(b), and his letters to offerors did not constitute a request for final proposal revisions.

This assessment does not aid defendant, however. Sgt. Vaccarella's admission that he did not issue a request for final proposal revisions ipso facto establishes that he violated FAR 15.307(b). That provision mandates that "each offeror still in the competitive range *shall* be given an opportunity to submit a final proposal revision." 48 C.F.R. § 15.307(b) (emphasis added). On September 28, 1998, after the evaluation of revised proposals, he determined that four offerors were still eligible for award of the contract. Absent a determination to the contrary, these offerors remained within the competitive range. Yet, he failed to give these offerors, with the exception of Daktronics, an opportunity to submit final proposal revisions. This action violated FAR 15.307(b). Moreover, Sgt. Vaccarella "favor[ed] one offeror over another" during discussions, which is prohibited by FAR 15.306(e), by: failing to allow any offerors other than Daktronics to

submit proposal revisions after September 25; and accepting revisions to Daktronics proposal on October 1, 1998, after the contract had been signed.

■ Furthermore, this conclusion is not dependent upon the court's holding *supra* that this procurement was conducted under Part 15; defendant conceded that FAR 15.306 applied, and the court holds that FAR 15.307(b) applied even if the procurement was conducted under Part 13. As an alternative holding, therefore, the court concludes that the Academy's failure to continue discussions with the other offerors or to request final proposal revisions from all offerors remaining in the competitive range violated these provisions.

Simplified acquisition procedures relax many of the FAR requirements and grant contracting officers broad discretion, but they do not grant a contracting officer unfettered discretion. When conducting a simplified acquisition, a contracting officer may elect to follow Part 15, or select appropriate provisions from that Part to apply. *See* 48 C.F.R. §§ 13.003(h)(2). 13.106–2(b). Sgt. Vaccarella chose the latter approach. He conceded that he opted to follow FAR 15.306 and, of particular relevance here, the provision governing discussions with offerors following the selection of the competitive range, FAR 15.306(d).

That election comes with baggage, however. FAR 15.307(b) completes the regulation of the discussion process; it governs the conclusion of discussions with offerors. The provision requires a contracting officer, at the conclusion of discussions, to issue a request for final proposal revisions by a common cut-off date. These final proposal revisions from the basis upon which the contract is awarded. This requirement is not merely surplusage; it is an essential final step in the competition process. By providing offerors remaining in the competitive range an oppor-

---

**49.** The present circumstances are distinguishable from those in *Cleveland Telecommunications*, 43 F.3d 655. In that case, offerors were notified that the deadline for receipt of amended proposals was the "final cut-off for receipt of any amendments." *Id.* at 657. Moreover, the plaintiff was informed that "the Government has no

further questions or need for clarification" concerning its proposal. *Id.* In the present case, offerors were neither informed that September 25, 1998 was the final deadline for submission of proposals, nor that discussions had been concluded.

tunity to present their final offers to the Government, it allows them to incorporate the knowledge they have gleaned from discussions; by providing a common cut-off date, it sets a level playing field on which they may compete for the contract. It allows the Government to reap the fruits of the discussion process. Without this opportunity, discussions with offerors readily would be subject to abuse, merely becoming a cover for an agency's discussions with the offeror it has selected to receive the contract prior to the formal source selection decision. FAR 15.307(b), therefore, is an essential requirement once an agency engages in the discussion process. In short, it cannot be severed from FAR 15.306(d).

In standard negotiated procurements, of course, compliance with FAR 15.307(b) is mandatory. The court holds that no less is permissible in the context of simplified acquisitions. An agency's decision under a simplified procurement to follow FAR 15.306(d) but not FAR 15.307(b), would not comport with its requirement to conduct all procurements in a fair and equitable manner. Offerors must be given an opportunity to submit a final proposal once discussions have been entered (providing they remain in the competitive range). Stated in other words, a contracting officer's decision to apply FAR 15.306(d) but not 15.307(b) is not an appropriate selection of Part 15 provisions. *See id.* § 13.003(h)(2).

In the context of this procurement, the Academy's solicitation and acceptance of repeated revisions to only Daktronics' technically unacceptable amended proposal (none of which, we find *infra*, ultimately rendered the proposal technically acceptable)[50] and its failure to seek a final proposal revision from plaintiff or other offerors cannot be considered to be fair and equitable, especially

where the agency had determined that the proposals submitted by plaintiff and two other offerors were technically acceptable. This conduct violated FAR 15.306(e), which prohibits discussions that favor one offeror over another, and FAR 15.307(b), which applied to this procurement once Sgt. Vaccarella had chosen to follow FAR 15.306(d).[51]

Plaintiff was prejudiced by these violations. If the Academy had not engaged in this additional round of discussions with Daktronics, its final proposal revision likely would have remained technically unacceptable with respect to several RFP criteria (including maintenance training) and noncompliant with other material aspects of the solicitation (including payment terms); it would thus have been ineligible for award. *See Burroughs,* 617 F.2d at 596; *Spectrum Controls Sys.,* 97–1 C.P.D. ¶ 89 at 3–4 (1997). Under that scenario, plaintiff, as a technically acceptable offeror, would have had a substantial chance of award. Alternatively, if the Academy had given plaintiff an opportunity to revise its amended proposal, it is reasonable to conclude that plaintiff would have taken that opportunity to improve its competitive standing. Plaintiff has asserted that he intended to augment his proposal in the areas of training and warranty but was given insufficient opportunity to do so. *See* Pl.'s Req. for Summ. J. at 25. The court finds it probable that plaintiff would have made his proposal more competitive in these areas if he had been given the opportunity to submit further proposal revisions or, at minimum, a final proposal revision. The court finds this sufficient, given the patent violations and the fact that the plaintiff appears pro se, to conclude that plaintiff was prejudiced by the Academy's violations of procurement regulations. *See Telos Field*

---

50. At the evidentiary hearing, Sgt. Vaccarella conceded that Daktronics' amended proposal was deficient with respect to several technical criteria, and thus technically unacceptable. *See* Tr. at 54, 62; *infra* § IV.A. Additionally, the court *infra* concludes that its final proposal revision (which was incorporated into its contract with the Academy) remained technically unacceptable. *See infra* § V.

51. Viewed from a different angle, the Academy's conduct constituted a de facto competitive range determination which created a competitive range of one (i.e., Daktronics). All other offerors were eliminated from further discussions with the Academy after September 25, 1998. Yet plaintiff's amended proposal was technically acceptable, whereas Daktronics' amended proposal was not. This de facto competitive range determination, therefore, was arbitrary and capricious and in violation of FAR 15.306(c)(4).

*Eng'g,* 73 Comp. Gen. 39, 43–44, 93–2 C.P.D. ¶ 275 at 6–7 (1993).

### B. FAR 52.212–1(f)

■ The agency's acceptance of revisions to Daktronics' amended proposal after the September 25, 1998 deadline also violated FAR 52.212–1(f), the late offer clause incorporated by reference into the RFP.[52] This serves as an independent basis for overturning the contract award. The late offer clause states: "Offers or modifications of offers received at the address specified for the receipt of offers after the exact time specified for receipt of offers will not be considered." 48 C.F.R. § 52.212–1(f). This provision, by its very terms, prohibits an agency from accepting revisions of offers submitted after the deadline established by an agency. It thus precludes an agency from accepting revisions of offers after the common cut-off date that it has set for revised proposals or final proposal revisions.

Defendant, in its post-hearing brief, assuming that simplified acquisition procedures applied here, cited several GAO decisions that have permitted agencies to accept quotations at any time prior to contract award. These decisions, however, are narrowly limited to the context of RFQ solicitations, and are thus inapposite in the context of FAR 52.212–1(f), which is controlling in this procurement.

The decisions cited by defendant, which include *West Coast Research* and *John Blood,* 96–2 C.P.D. ¶ 233 (1996), hinge upon the distinction between an offer (submitted in response to an RFP) and a quotation (submitted in response to an RFQ). In *John Blood,* the GAO stated that "[u]nder simplified acquisition procedures, agencies generally may seek and consider revisions to a quotation any time prior to award." *Id.* at 2

(citing *DataVault Corp.,* 92–2 C.P.D. ¶ 166 at 2 (1992)). The decision on which *John Blood* relied offered the following rationale:

> An RFQ, unlike an invitation for bids (IFB) or request for proposals (RFP), does not seek offers that can be accepted by the government to form a contract. Rather, the government's purchase order is the offer which the proposed supplier may accept through performance or by a formal acceptance document. It follows that, generally, the government may seek and consider revisions to a quotation under small purchase procedures any time prior to the government's issuance of a purchase order.

*DataVault,* 92–2 C.P.D. ¶ 166 at 2 (citations omitted); *see also, e.g., Brewer–Taylor Assocs.,* 97–2 C.P.D. ¶ 124 at 2 (1997); *Safety Storage, Inc.,* 97–1 C.P.D. ¶ 32 at 2 (1997); *ATF Constr. Co.,* 95–2 C.P.D. ¶ 29 at 2 (1995). This rationale does not apply to offers submitted in response to an RFP, which is the present scenario.

There is a second reason why *John Blood* and similar cases have no application here— this solicitation included a late offer clause which expressly prohibited the Academy's acceptance of late offers. As these GAO decisions acknowledge, a second basis for their holdings was the absence of a late quotation clause: "[T]he language of an RFQ is not generally considered as establishing a firm closing date, absent a late quotation provision (not present here), expressly providing that quotations must be received by that date in order to be considered." *Brewer–Taylor,* 97–2 C.P.D. ¶ 124 at 2; *see also, e.g., Safety Storage,* 97–1 C.P.D. ¶ 32 at 2–3; *John Blood,* 96–2 C.P.D. ¶ 233 at 2; *ATF Constr.,* 95–2 C.P.D. ¶ 29 at 2.[53] That is not the case here because FAR 52.212–1(f) expressly prohibited the Academy from considering late offers or modifications of offers.[54]

---

52. FAR 52.212–1 is a mandatory clause in all commercial item procurements, *see* 48 C.F.R. § 12.301(b)(1), regardless of whether the procurement is conducted according to Part 13 or Part 15 procedures.

53. Small purchase procurements generally do not contain late quotation clauses. *See Alpha Executive,* 92–1 C.P.D. ¶ 197 at 3. One of the cases cited failed to indicate whether the RFQ contained a late quotation clause; it did not rely,

therefore, on this second rationale. *See DataVault,* 92–2 C.P.D. ¶ 166.

54. This holding is consistent with *Alpha Executive,* 92–1 C.P.D. ¶ 197, but at odds with *West Coast Research,* the only two simplified acquisition decisions in which the solicitation contained a late quotation or late offer clause. In *Alpha Executive,* the GAO upheld an agency's refusal to accept a quotation submitted after the deadline stated in the RFQ. It held that the agency's

In conclusion, the Academy's acceptance of proposal modifications from Daktronics after September 25, 1998 violated FAR 52.212–1(f). This violation prejudiced plaintiff because, absent these revisions, Daktronics' amended proposal was technically unacceptable, *see infra* § IV.A, and thus not eligible for contract award. *See Burroughs,* 617 F.2d at 596; *Spectrum Controls Sys.,* 97–1 C.P.D. ¶ 89 at 3–4. The agency's violation of FAR 52.212–1(f) thus provides an alternative basis for granting plaintiff's motion for summary judgment.[55]

## IV. Improper Evaluation of Proposals

Plaintiff has raised numerous allegations regarding the Academy's misevaluation of both its own and Daktronics' proposals. Plaintiff contends that the agency's determination that Daktronics' amended proposal was technically acceptable was unreasonable. He also asserts that his proposals should have received higher evaluation ratings. For the reasons stated below, the court agrees.

 CICA requires that agencies "shall evaluate ... competitive proposals ... based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1) (1994); 41 U.S.C. § 253b(a) (1994); *see also Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 44 (1997). The FAR extends this requirement to include both evaluation factors and subfactors. *See* 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."). These

CICA requirements are in accordance with the fundamental principle that the Government "may not solicit proposals on one basis and make award on another basis." *See Clean Florida, Inc.,* 88–2 C.P.D. ¶ 411 at 2 (1988); *see also Idaho Norland Corp.,* 88–1 C.P.D. ¶ 529 at 3, *reconsideration denied,* 88–2 C.P.D. ¶ 103 (1988). Accordingly, this court may grant relief if the plaintiff proves that the Government evaluated proposals on a basis different from that announced in the solicitation and that it was prejudiced as a result. *See Analytical & Research Tech.,* 39 Fed.Cl. at 44; *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 728 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988); *Development Alternatives, Inc.,* 98–2 C.P.D. ¶ 54 at 4 (1998).

This aspect of CICA applies equally to procurements conducted under simplified procedures. *See* 48 C.F.R. § 13.106–2(a)(2); *Creative Inv. Research,* 94–1 C.P.D. ¶ 84 at 2 (1994); *Tahoma Cos.,* 93–2 C.P.D. ¶ 162 at 2–3 (1993). Consequently, the GAO has upheld protests where an agency failed to evaluate quotations in accordance with evaluation factors stated in the solicitation. *See, e.g., Vocational Resources, Inc.,* 91–1 C.P.D. ¶ 414 (1991); *Armour of Am.,* 90–1 C.P.D. ¶ 304 (1990).

### A. Improper Evaluation of Daktronics' Proposals

#### 1. Improper Award of (+ +) Ratings to Daktronics

Plaintiff asserts that the Academy's award of three (+ +) ratings to Daktronics'

---

decision was reasonable because the solicitation did contain a late quotation clause. *See* 92–1 C.P.D. ¶ 197 at 3. *West Coast Research* appears to be to the contrary. The solicitation, conducted as a commercial item procurement, contained FAR clause 52.212–1, and thus the late offer provision at issue here, FAR 52.212–1(f). The GAO nevertheless held that it saw "nothing improper in allowing [the successful offeror] to submit a quotation after the closing date." *West Coast Research,* 1999 WL 43513 at *2. No mention was made of the presence of the late offer clause in the solicitation. *West Coast Research* thus appears to be a departure from prior GAO opinions. Accordingly, the court is unwilling to place any weight on that decision. *See Lyons Sec. Servs., Inc. v. United States,* 38 Fed.Cl. 783, 786 (1997).

55. Furthermore, the Academy's acceptance of Daktronics' proposal modifications after the September 25 deadline contravened the instruction given to offerors that revised proposals *"must* be received by this office no later than 25 Sep 1998 at 3:00 Mountain Standard Time." Admin. R., tabs 8 & 14 (emphasis added). These communications established a mandatory, common deadline for receipt of proposals; it created a reasonable expectation by offerors that the Academy would not accept revisions to amended proposals submitted after that date (at least until after further discussions were held). The court concludes that the agency's subsequent acceptance of Daktronics' revisions was not consistent with the principle that competition must be conducted in a fair and equitable manner.

amended proposal was arbitrary and capricious.[56] We agree.

### a. Training

Daktronics initial proposal received two (+ +) ratings for the operator and maintenance training subfactors, in addition to two (0) ratings. Defendant asserts that the Academy used the (+ +) ratings as an "internal marker" to identify those aspects of an offeror's proposal that exceeded the RFP specifications and had a particular benefit to the Academy. Even if one accepts this post facto explanation of how the (+ +) ratings were employed, the agency's award of both a(0) and a (+ +) for each of these subfactors has no rational basis; one or the other, or both, must be wrong. We conclude that neither (+ +) rating had any rational basis, and that Daktronics' initial and amended proposals were deficient with respect to the maintenance training criterion.

With regard to maintenance training, Daktronics' initial proposal offered to provide an unspecified quantity of on-site training [ ]. It thus failed to comply with the requirement that offerors provide at least eight hours of on-site training for two individuals. Yet, both evaluators found that Daktronics met the specification and no discussions were held with the company on this issue.[57] Because Daktronics' amended proposal did not rectify the omission regarding the quantity of on-site training, it too was technically unacceptable, as defendant has conceded. See Def.'s Mot. Summ. J. at 8. The agency's award of a (+ +) rating to Daktronics' amended proposal with regard to technical requirements lacked any rational basis. See Technology Servs. Int'l, Inc., 97–2 C.P.D. ¶ 113 at 4–5 (1997) (abrogating a "benefit" rating because the awardee's proposal failed to fully comply with a technical requirement).

Although defendant has conceded that Daktronics' amended proposal, which was submitted on the morning of September 24, was deficient with respect to the maintenance training criterion, see Def.'s Mot. Summ. J. at 6–7, it argues that Minnaert's oral representations during a telephone conversation with Sgt. Vaccarella that afternoon rectified the deficiency. See id. at 7. Subsequently, on October 1, 1998, Daktronics submitted a revision to the maintenance training section of its proposal which incorporated Minnaert's oral

56. Although plaintiff does not challenge the ultimate utilization of (+ +) ratings to evaluate proposals, the court notes that this scheme provides further evidence of the arbitrary manner in which this procurement was conducted. The RFP specified the use of a three-tier ((+), (0), and (-)) rating system for evaluating the technical requirements subfactors. The Academy, however, employed a four-tier rating system, which included an unstated (+ +) rating.

Sgt. Vaccarella testified that he had developed this system in an earlier procurement, drawing from the USAF's color rating system, which is defined in Appendix BB of the AFFARS, see AFFARS App. BB, § BB–304(b) (1998), and is mandatory for most procurements exceeding $5,000,000. See id. § BB–101. Sgt. Vaccarella's system, however, deviated from the color rating system: only one rating (blue/exceptional) in the USAF color rating system applies to proposals that exceed RFP specifications (the other three ratings apply to proposals that merely meet, or fail to meet, the specifications); his system abandoned the lowest (red/unacceptable) rating of the USAF color system and created a second rating for proposals that exceeded RFP specifications. Although this system was not explicitly prohibited by the FAR, it adds to the impression that the procurement was conducted in an unorthodox manner.

Of greater concern to the court, Sgt. Vaccarella provided no explanation for the agency's departure from the rating system stated in the RFP. Admittedly, the FAR permits agencies broad discretion in selecting the rating system to be used in a procurement. 48 C.F.R. § 15.305(a). Nevertheless, this regulation does not grant contracting officers carte blanche to notify offerors of one rating system in the RFP and to then apply a different system during the evaluation of proposals. See Clean Florida, 88–2 C.P.D. ¶ 411 at 2 (stating the "fundamental principle that a contracting agency may not solicit proposals on one basis and make award on another basis"); Idaho Norland, 88–1 C.P.D. ¶ 529 at 3. Moreover, this principle applies equally in the context of simplified acquisitions. See General Metals, 92–1 C.P.D. ¶ 486 at 2. Such action is arbitrary and capricious and provides grounds for granting a protest if it prejudices unsuccessful offerors. Plaintiff, however, did not claim any prejudice from this aspect of the procurement.

57. At the evidentiary hearing, in response to questioning by the court, Sgt. Vaccarella conceded that the proposal was deficient and that his failure to spot this deficiency and raise it with Daktronics "was an error on [his] part." Tr. at 54.

"amendment;" this revision was incorporated into Daktronics' contract.

■ Defendant's argument cannot be reconciled with the core principle that "agencies are required to evaluate proposals based on the content of the proposal itself[;] an offeror in a negotiated procurement must demonstrate within the four corners of its proposal that it is capable of performing the work upon the terms most advantageous to the government." *Patent Scaffolding Co.*, 93–1 C.P.D. ¶ 158 at 6–7 (1993); *see also Northwestern Travel Agency, Inc.*, 91–2 C.P.D. ¶ 363 at 6 (1991). Here, the Academy selected the awardee on the basis of amended proposals timely submitted prior to the September 25, 1998 deadline. Moreover, because amended proposals consisted only of revisions to deficient areas of offerors' initial proposals, ratings for technical specifications were derived primarily from scores awarded on the basis of initial proposals.

■ The Academy awarded Daktronics its three (+ +) ratings on the basis of its initial proposal; therefore, these ratings must be substantiated by material within the four corners of that proposal. Yet, Daktronics' initial proposal contained no indication that it would provide the minimum level of training specified in the RFP. Minnaert's oral statements to the contrary were neither timely presented prior to the deadline for submission of initial proposals, nor within the four corners of the proposal. The Academy's reliance upon this oral representation was therefore erroneous. The maintenance training program offered in Daktronics' proposals

was, in fact, deficient. Accordingly, the agency's award of (+ +) ratings to Daktronics for this subfactor was arbitrary and capricious as a matter of law.[58]

The two (+ +) ratings for operational and maintenance training were arbitrary and capricious for another reason: the Academy awarded these ratings on the basis of Daktronics' offer to provide [ ]. *See* Tr. at 71–72; Admin. R., tab 19. The evaluation sheets and Sgt. Vaccarella's testimony revealed that the agency considered [ ] to be a substantial "benefit." Yet, they were expressly precluded by the RFP, which emphasized that "[a]ll training must take place on the United States Air Force Academy." Admin. R., tab 23 at 5. As discussed above, CICA, the FAR, and court and GAO decisions require agencies to evaluate proposals solely on the basis of criteria stated in the solicitation. Because the RFP here unambiguously informed offerors that off-site training would not be acceptable, the agency's award of (+ +) ratings to Daktronics for either training subfactor was arbitrary and capricious.[59]

b. Warranty

Daktronics' initial proposal received a "benefit" rating for the warranty subfactor, in addition to a (+) rating. We find that both ratings were unreasonable because the warranty offered by Daktronics failed to meet the criteria stated in the RFP.

The RFP required offerors to provide a "one-year warranty for parts, labor and in-

**58.** Sgt. Vaccarella's September 24 memorandum also casts doubt on defendant's present account of Minnaert's representations on that date. The memo states: "The on site training, *as stated in the proposal*, is over and above (or vise [sic] versa) [ ]." Admin. R., tab 15A1 at 1 (emphasis added). This indicates that Minnaert orally confirmed Daktronics was offering [ ] on-site [ ] training, but makes no mention of a representation regarding the *quantity* of on-site training offered; it simply refers back to the amended proposal, which is silent on this matter. In the court's view, it is improbable that Sgt. Vaccarella would have omitted reporting any representation made relating to that matter; it is more probable that Sgt. Vaccarella had not identified the deficiency at that time, and hence did not discuss it during that conversation. The court considers this contemporaneous record of the telephone

conversation to be a more accurate account than defendant's subsequent statements in the course of discovery.

**59.** If the Academy had determined that it wanted offerors to propose off-site training (in addition to the on-site training specified in the RFP), it was required to amend the solicitation to allow all offerors to compete on this basis. *See* 48 C.F.R. § 15.206(a); *Labat–Anderson, Inc.*, 71 Comp. Gen. 252, 259, 92–2 C.P.D. ¶ 193 at 9–10 (1992). However, the Academy apparently has not changed its needs. On March 18, 1999, it reissued the solicitation and retained the on-site training limitation: "All training shall take place on the United States Air Force Academy." Commerce Bus. Daily, Mar. 18, 1999, at 33.

stallation ... for the signs ... [and] all sign hardware/software from [the] time the signs are made fully operational." *Id.* at 5. Daktronics' initial proposal offered a "parts and labor warranty for 1 year," which consisted of [ ]. Admin. R., tab 12 § 2f. The warranty included [ ] *Id.* (emphasis added).

We find that Daktronics' warranty failed to comply with the specification in numerous respects: (1) it failed to offer labor to repair the signs, i.e., to remove defective parts from the *scoreboard* and to replace them with parts from [ ]; (2) it did not cover hardware other than electronic components; (3) it failed to cover software supplied with the sign; (4) it did not cover sign installation; and (5) it neglected to specify the date on which the warranty would commence. Nevertheless, both evaluators found that Daktronics' initial proposal exceeded the specification for this subfactor, awarding it both (+) and (+ +) ratings, the latter based upon the offering of the spare parts package. As a result, the discussion questions in the request for amended proposals sent to Daktronics did not address the warranty.

At the evidentiary hearing, Sgt. Vaccarella conceded that Daktronics' initial proposal was not in compliance with the RFP because it failed to cover installation. *See* Tr. at 62. He also acknowledged that it failed to state the date on which the warranty would commence. *See id.* at 105–06. Consequently, he admitted that his (+) rating for Daktronics' warranty was erroneous. *See id.* at 70. Ipso facto, Daktronics' amended proposal, which did not amend the warranty offered, was also deficient.

Sgt. Vaccarella testified that he subsequently realized that the warranty in the amended proposal was deficient and initiated a telephone call to Minnaert on the afternoon of September 24. He further testified that he was given verbal assurances that Dak-

tronics' warranty covered installation and would commence on the date on which the signs became fully operational, and that these assurance rectified the warranty deficiencies.

This decision by the Academy was unreasonable because it was not supported by information submitted within the four corners of Daktronics' initial proposal.[60] The warranty submitted in Daktronics' initial and amended proposals was deficient in the five areas stated above. Defendant has conceded that the warranty was deficient. Given these facts, the Academy's award of (+) and (+ +) ratings to this subfactor was arbitrary and capricious. *See Technology Servs. Int'l,* 97–2 C.P.D. ¶ 113 at 4–5.

### 2. Consideration of Undisclosed Technical Subfactors

Plaintiff asserts generally that the Academy failed to follow its evaluation plan, in particular with regard to the training and warranty subfactors. In addition to improperly considering Daktronics' offer to provide [ ], the agency appears to have considered and rated technical criteria not stated in the solicitation. These evaluation irregularities violated provisions of CICA and the FAR. Plaintiff, however, was not prejudiced by these violations.

The Academy awarded two (+) ratings to Daktronics' initial proposal for two features of the proposal that related to operator training: (1) [ ]; and (2) [ ]. *See* Admin. R., tab 13 at 5.[61] By recognizing these two features as additional evaluation criteria, both of which were rated favorably and improved the competitive standing of Daktronics' proposal, Sgt. Vaccarella improperly deviated from the technical criteria stated in the RFP. *See* 48 C.F.R. §§ 13.106–2(a)(2), 15.305(a). In other words, by granting these additional scores to

---

**60.** Moreover, the contemporaneous documentation of the September 24 conversation only partially supports Sgt. Vaccarella's testimony. One of the memoranda prepared on September 24 confirms that Daktronics did notify Sgt. Vaccarella of the effective date. It states: "Warrant [sic] is effective upon full operation of the signage [sic] and effective for 1 full year from that date." Admin. R., tab 15A1 at 1. There is no reference, however, to any discussion regarding

the scope of the warranty. We find it improbable that the memoranda would discuss one verbal agreement to revise the warranty, but not another, especially one that broadened its scope of coverage.

**61.** These ratings were in addition to the (0) and (+ +) ratings for the operator training subfactor, discussed *supra.*

Daktronics, Sgt. Vaccarella created an unlevel playing field: Daktronics overall technical rating was assessed on the basis of its ratings for the twenty-three stated criteria *as supplemented* by these two "bonus" scores,[62] whereas other offerors may not have received the same opportunity to receive "bonuses."[63] Although it is unclear how large a role these two "bonus" subfactors played in the overall (+) rating for technical requirements received by Daktronics, the fact that Sgt. Vaccarella found them worthy of note on his evaluation narrative sheet is evidence that they weighed in Daktronics' favor.[64]

### 3. Failure to Comply with RFP Criteria

The Academy also improperly determined that Daktronics' amended proposal was compliant with all RFP specifications. We have already discussed the deficiencies of Daktronics' proposal with respect to the warranty and maintenance training criteria. In addition, Daktronics' proposal failed to comply with the following specifications or material solicitation terms: (1) software compatibility with Windows 95; (2) display area; (3) overall sign area; (4) light intensity; (5) side panel lettering color; and (6) payment terms. Each of these deficiencies on its own was sufficient to render Daktronics' proposal technically unacceptable and thus ineligible for award.

### a. Compatibility with Windows 95 Operating System

The RFP required offerors' sign operating software to operate on the Windows 95 operating system. Minnaert's e-mail message to Sgt. Vaccarella on September 24, 1998, however, acknowledged that Daktronics' software did not meet that specification—instead, its software operated on the [ ] platform. Nevertheless, Sgt. Vaccarella upgraded Daktronics' score with respect to this subfactor from (-) (based upon Daktronics' initial proposal) to (0). Neither his evaluation scoring sheet nor his evaluation narrative provide an explanation for this decision; the latter merely states "[a]ll deficiencies corrected." Admin. R., tab 16 at 5. This evaluation error prevented Daktronics' amended proposal from being rated as "technically unacceptable."

### b. Minimum Display Area and Overall Area

Daktronics' amended proposal failed to obligate the company to providing a sign that met the minimum display area and overall sign area dimensions stated in the RFP. The only document in Daktronics' proposal that

---

**62.** These scores are "bonus" factors to this extent: the (+) rating signified that an offerors' proposal "exceeded" a technical criterion. If the Academy considered [ ] features of Daktronics' operator training proposal to exceed the minimum criteria for that subfactor, it should simply have awarded Daktronics a (+) for operator training. Instead, it awarded Daktronics a(0) for operator training per se, a (+ +) for the offered [ ], and two (+) ratings for the [ ] (i.e., four scores for a single technical subfactor). This scheme impermissibly tilted the playing field in Daktronics' favor. We note also that these four scores appear to be irreconcilable with one another.

**63.** Because the evaluation sheets for the other four offerors are not in the administrative record, the court cannot determine whether any of these offerors were similarly awarded "bonus" scores.

**64.** Nevertheless, plaintiff was not prejudiced by these violations because the Academy improperly awarded his proposals two additional (+) ratings for offering features not contemplated in the RFP. In his initial proposal submission, plaintiff

offered to provide the Academy with [ ]. Sgt. Vaccarella evaluated this offer as a new, separate technical subfactor and awarded it a (+) rating. There is no record that all other offerors were provided an opportunity to compete on this same basis.

The second "bonus" rating received by Nu-Way was given for [ ] that the company offered with each of its three amended proposals. [ ] that the Academy had not contemplated in the RFP. Without informing other offerors that it would consider such [ ], the agency accepted this proposal and awarded each of plaintiff's proposals an additional (+) rating.

Both of these actions disadvantaged other offerors vis-a-vis plaintiff and violated the CICA and FAR provisions requiring agencies to evaluate offers solely on the basis stated in the solicitation. Plaintiff thus benefitted from the same agency misconduct of which it now complains—the Academy's failure to adhere to its evaluation plan. As a result, it cannot show that it was prejudiced by this misconduct. *See PADCO, Inc.*, 96–1 C.P.D. ¶ 142 at 3–4 (1996); *Presearch, Inc.*, 94–2 C.P.D. ¶ 197 at 4–5 (1994).

addressed these two criteria was a technical drawing of the sign which indicated that the sign [ ]. A proviso at the bottom of the drawing, however, stated: [ ] Admin. R., tab 12 § 2a. This disclaimer precluded the agency from relying upon the drawing as a representation that it would provide a sign compliant with the minimum size criteria. The proposal should have been rated as deficient with respect to both criteria.

### c. Light Intensity and Side Panel Lettering Color

The RFP specified that the LED display must emit a light intensity of 5000 candelas and that the offeror was required to provide translucent white customized lettering for the side panels. Neither Daktronics' proposal nor the accompanying product literature responded to these requirements. Accordingly, the Academy erred in finding that the Daktronics' initial and subsequent proposals complied with these mandatory criteria.

### d. Payment Terms

The RFP instructed offerors that the procurement would be conducted in accord with FAR 52.212–4, which states, in pertinent part, that the Government will make payment upon delivery and acceptance of the goods being procured. See 48 C.F.R. § 52.212–4(i). Both Daktronics' initial and amended proposals, however, included a payment provision that [ ]. This payment provision was incompatible with the FAR payment term; indeed, Sgt. Vaccarella noted that fact on his evaluation sheet for Daktronics' initial proposal. Nevertheless, he did not raise this concern with Daktronics during his discussions with the company. As a result, the amended proposal submitted by Daktronics was also deficient in this respect; yet, Sgt. Vaccarella selected Daktronics as the putative awardee.

Solicitation payment terms constitute a material condition; consequently, if an offeror's proposal fails to conform to the RFP's payment terms, it "should be considered unacceptable and may not form the basis for an award." *Vertiflite, Inc.*, 94–1 C.P.D. ¶ 304 at 2 (1994); *see also E.C. Campbell, Inc.*, 86–1 C.P.D. ¶ 565 at 3 (1986); *cf. Valley Forge*

*Flag Co.*, 84–2 C.P.D. ¶ 251 at 2 (1984) (holding that a bid specifying payment within 20 days was a material deviation from the solicitation's 30–day payment term). As the GAO stated in *Vertiflite:* "[t]o consider [an offeror]'s offer to perform using more favorable payment terms would provide [the offeror] with an unfair competitive advantage since the other offerors submitted their offers based upon the terms of the solicitation." 94–1 C.P.D. ¶ 304 at 2–3.

Defendant contends that Sgt. Vaccarella remedied this deficiency in his telephone conversation with Minnaert on the afternoon of September 24. Neither of the memoranda prepared by Sgt. Vaccarella to memorialize Minnaert's representations in the course of that conversation, however, mention any discussion of that subject. Moreover, even if that subject was discussed and Daktronics agreed to correct its amended proposal, the proposal was deficient as submitted, as Sgt. Vaccarella himself conceded at the evidentiary hearing. See Tr. at 52. As a matter of law, the proposal was unacceptable and ineligible for award. See *Vertiflite*, 94–1 C.P.D. ¶ 304 at 2.

This conclusion is consistent with Sgt. Vaccarella's treatment of one of the other offerors—Offeror X—which he determined to be ineligible for award. One of the reasons cited for this determination was the fact that Offeror X "proposed payment terms not consistent with the solicitation: [ ] Admin. R., tab 18 at 2. It appears irrational to exclude one offeror, at least in part, on the basis of its use of an invalid payment condition, yet to select Daktronics, which offered a similar condition, as the awardee.

### B. Improper Evaluation of Plaintiff's Proposal

Plaintiff also alleges that the Academy mis-evaluated his proposals by failing to recognize that they exceeded certain technical criteria. In other words, plaintiff disputes the (0) ratings received and contends that it should have received (+) or (+ +) ratings for these criteria. We find that the Academy's evaluation of plaintiff's proposals was arbitrary and capricious with respect to two criteria: (1) warranty; and (2) maintenance

and operational training. With regard to a third—[ ]—plaintiff has established evaluation errors but is not entitled to summary judgment because the rating attributed to his proposals was arguably not erroneous.

### 1. Warranty

Plaintiff alleges that he offered the identical [ ] offered by Daktronics, yet received only a(0) for this subfactor, whereas Daktronics received both (+) and (+ +) ratings. Plaintiff agreed to provide a warranty for "1 yr [sic] after made operational." Admin. R., tab 6 at 5. In addition, he offered to provide the [ ] for each of his three proposals.[65] *Id.* at 2. Defendant contends that the Academy was warranted in awarding a (+ +) rating to Daktronics for its [ ] but only a(0) to Nu–Way given: (a) the lack of specificity in plaintiff's proposal; and (b) the fact that plaintiff proposed to act as a middle-man for Daktronics. These explanations do not provide a rational basis for the disparity in scores.

With regard to the "lack of specificity" assertion, this argument appears baseless here, where plaintiff had offered to provide (at least for proposal "A") [ ] and the Academy possessed a detailed description of [ ] (from Daktronics' proposal).[66] The agency's concern regarding plaintiff's role as a "middle-man" appears unfounded. There is no indication that plaintiff's role would impact the benefit of the warranty to the agency. If Sgt. Vaccarella had any concerns in this regard, this would have been a legitimate area in which to seek further information from plaintiff during discussions. Instead, the agency ceased discussions with all offerors except Daktronics after September 24. In sum, the agency has provided no rational basis for considering a program offered by Daktronics as a "benefit" but to attribute no beneficial weight to the same program offered by plaintiff.

### 2. Training

Plaintiff asserts that the Academy erred by failing to recognize that his offers provided [ ]. We agree.

The RFP stated that *"[a]t least eight–8 hours of training shall be provided"* for both operational and maintenance training; this training was required to be provided at the USAF Academy. Admin. R., tab 23 at 5 (emphasis added). Operational training was required for four individuals; maintenance training for two. In response, Nu–Way offered to meet these criteria for proposal "A." For proposals "B" and "C," [ ] Admin. R., tab 6 at 7–8. Yet, the Academy awarded only (0) ratings for each subfactor for each of these proposals.

Defendant argues that the Academy [ ] Def.'s Mot. Summ. J. at 9. The agency directed offerors to offer "at least" eight hours of training, and specifically informed them that their offers would receive a (+) rating for any subfactor if they "exceeded" the solicitation specification. In light of these instructions, it is simply incomprehensible for defendant to now assert that plaintiff's offer [ ].[67]

The Academy's evaluation becomes even more bizarre when one considers that it awarded Daktronics a (+ +) rating for both training subfactors on the basis of [ ], which was *expressly precluded* by the RFP. Further, Daktronics failed even to state that it would comply with the *minimum* quantity of maintenance training. The Academy's scor-

---

**65.** In its pre-hearing brief, defendant also argues that if Daktronics' warranty was deficient, as plaintiff claims, so was plaintiff's. This is not so. Plaintiff agreed to meet the warranty specification and [ ]. It did not explicitly state that it relied solely on the [ ] to meet the warranty specification.

**66.** The court notes that an agency may consider information in its possession relevant to an offeror's proposal; this is an exception to the general rule that an agency may only look within the four corners of a proposal when it is evaluating a proposal. *See, e.g., Fidelity Technologies Corp.,*

97–1 C.P.D. ¶ 197 at 5 (1997); *Safeguard Maintenance Corp.,* 96–2 C.P.D. ¶ 116 at 12 (1995). It defies logic for the Academy to assert that it had insufficient information to evaluate plaintiff's warranty when, at the same time, it possessed a detailed description of that very warranty.

**67.** We recognize that, assuming arguendo that (+ +) ratings were appropriate, the award of a (+ +) rating involves a considerable degree of discretion. We accept, therefore, defendant's argument that it did not perceive any significant "benefit" in plaintiff's offer.

ing with regard to the training criteria was arbitrary and capricious.

#### 3. [ ]

Finally, plaintiff argues that it should have received a (+ +) rating for offering to provide [ ] because other offerors received such a rating for making similar offers [ ]. We agree that plaintiff has established that errors were made regarding the evaluation of this subfactor, but is not entitled to summary judgment on the basis that an error was made with respect to its proposals.

Three offerors, including plaintiff, offered to provide the Academy with [ ]. Although the administrative record is somewhat clouded by the fact that evaluation sheets for offerors other than Nu–Way and Daktronics are not included, Sgt. Vaccarella's Summary of evaluation scores states that Offerors Y and Z [ ] Admin. R., tab 18 at 2–3. Plaintiff received only a (+) for offering [ ].

Defendant's only response in its pre-hearing brief was that the accompanying matrix, also prepared by Sgt. Vaccarella, does not list these (+ +) ratings for Offerors Y or Z; presumably, then, the statements to the contrary in the Summary were erroneous. We choose to rely on the detailed narrative Summary rather than the abbreviated matrix. As noted earlier, the matrix contains numerous errors and cannot be considered a reliable source. *See supra* note 28.

At the evidentiary hearing, Sgt. Vaccarella testified that the Academy did not consider [ ] to be a benefit and thus he did not err in awarding a (+) rating to each of plaintiff's proposals for [ ]; instead, he had erred by awarding Offerors Y and Z each a (+ +) rating. *See* Tr. at 84. This testimony is supported by his summary narrative regard-

ing Nu–Way's proposals, which stated that [ ] offered by plaintiff, "although exceeds [sic] the specifications, are not considered a benefit." Admin. R., tab 18 at 2.

Sgt. Vaccarella's admission establishes that errors were made in the evaluation of this "bonus" item, but casts doubt on plaintiff's assertion that the error was made with respect to *its* proposals. We conclude that the Government has presented sufficient evidence to rebut plaintiff's assertion that the (+) ratings attributed to plaintiff's proposals with regard to this [ ] subfactor were arbitrary and capricious.

#### C. Prejudice

Plaintiff was clearly prejudiced by many of these errors.[68] The Academy awarded the contract to Daktronics primarily on the basis of its overall (+) rating for the technical requirements evaluation factor—Daktronics was the only offeror to receive a (+) rating. In turn, Daktronics received this overall (+) rating substantially because it received (+ +) ratings for the training and warranty subfactors. *See id.* at 3. If the Academy had evaluated Daktronics' initial proposal in a reasonable manner, Daktronics' proposal would have received (-) ratings for the maintenance training and warranty factors, and would not have received a single (+ +) rating. As a result, each of plaintiff's initial proposals would received fewer (-) ratings for the technical requirements subfactors (and one would have received more (+) ratings) than Daktronics' proposal.[69] Accordingly, plaintiff would have had a substantial chance of award.

Moreover, if plaintiff's proposals had been evaluated according to the terms of the solici-

---

68. Plaintiff was not prejudiced by the Academy's consideration of unstated evaluation subfactors. *See supra* note 64. Nor was it prejudiced by the agency's failure to determine compliance with the side panel lettering specification because plaintiff also failed to state compliance with that criterion. *See PADCO*, 96–1 C.P.D. ¶ 142 at 3–4; *Presearch*, 94–2 C.P.D. ¶ 197 at 4–5.

69. Taking into account the court's findings regarding Daktronics' offered warranty and training, the scoring of initial proposals for the 23 technical criteria would have been as follows:

| Proposal | (−) | (0) | (+) | (+ +) |
|---|---|---|---|---|
| Nu–Way "A" | 2 | 21 | 0 | 0 |
| Nu–Way "B" | 4 | 17 | 2 | 0 |
| Nu–Way "C" | 3 | 17 | 3 | 0 |
| Daktronics | 7 | 14 | 2 | 0 |

This table does not take into account mistakes regarding the evaluation of plaintiff's proposals, discussed *supra,* that would have increased its ratings for several criteria.

tation, they would have received (+) ratings for the warranty, operational training, and maintenance training criteria. Because they were also technically acceptable, it is likely that they would have received an overall (+) rating for technical requirements. Again, plaintiff would have had a reasonable likelihood of award.

## V. Deficiencies Remaining in Daktronics' Final Proposal Revision

As an alternative basis for its holding that the actions of the Academy were arbitrary and capricious, the court finds that the agency's eventual acceptance of Daktronics final proposal—the amended proposal as revised by various submissions through October 1, 1998—was arbitrary and capricious because even that proposal was not compliant with the RFP. Despite an exclusive round of discussions with Sgt. Vaccarella and numerous opportunities to revise its amended proposal, Daktronics' final proposal was still technically unacceptable. The Academy, therefore, acted arbitrarily and capriciously by entering into a contract to Daktronics.

Daktronics' final proposal failed to comply with at least six specifications: (a) warranty; (b) display area; (c) overall area; (d) paint color; (e) light intensity; and (f) side panel lettering color.[70] With regard to the warranty, the court has found that the warranty offered in Daktronics' amended proposal was deficient in five areas. Even if we were to accept defendant's assertion that the warranty was subsequently orally amended to encompass installation and define the commencement date, the warranty remained deficient in the other three areas. Consequently, the warranty incorporated into Daktronics' contract was deficient.

Daktronics' final proposal also remained deficient with respect to the display area and overall sign area criteria because the revised technical drawing of the scoreboard, submitted to the Academy on October 1, 1998, failed to remove the proviso that "dimensions are subject to change." Admin. R., tab 23 at 24. Moreover, the revised technical drawing

omitted the provision stating that Daktronics would comply with the Strata blue paint color requirement, which had been included in the drawing submitted with Daktronics' initial proposal. The final proposal thus did not comply with that mandatory specification. The remaining two specifications—light intensity and side panel lettering color—were never addressed by Daktronics, and thus never met.

In short, even the final proposal presented by Daktronics was technically unacceptable and ineligible for award. The Academy's award of the contract to Daktronics was, therefore, arbitrary and capricious.

## VI. Proposed Remedy

This procurement was mishandled from start to finish. It was riddled with violations of procurement regulations and arbitrary and capricious conduct by the contracting officer. For all of the reasons stated in sections II, III, IV, and V *supra,* the contract award to Daktronics must be set aside. This leaves the court, however, with the decision whether to set-aside the entire procurement or to devise some remedy short of re-procurement. For the reasons set forth below, we elect the former remedy.

Plaintiff has vigorously argued, in its request for summary judgment and at oral argument, that resolicitation would be inappropriate. Instead, plaintiff asks the court to direct the Academy to re-evaluate amended proposals according to the terms of the RFP. To support this remedy, plaintiff asserts that errors made by the agency "were only harmful to Nu–Way," and all offerors "were equally informed of the requirements, provided an opportunity to correct deficiencies, and evaluated using the same criteria." Pl.'s Req. for Summ. J. at 6. The court disagrees.

An order directing the Academy to re-evaluate amended proposals would prejudice offerors, such as Daktronics, that did not receive the benefit of adequate discussions following the submission of initial offers. As

---

**70.** The final proposal (and the contract) also failed to include a delivery date. Thus the contract did not bind Daktronics to deliver and install the scoreboard by a specific date. This error did not prejudice plaintiff.

discussed in this opinion, Daktronics' initial proposal was deficient with regard to several key technical specifications, including the maintenance training and warranty criteria, and a number of material non-technical requirements, including payment terms. Yet the agency failed to advise Daktronics of these deficiencies in its September 23, 1998 discussions letter. Without notice of these material deficiencies, the agency's discussions with Daktronics were not meaningful. *See Analytical & Research Tech.*, 39 Fed.Cl. at 48 (holding that, to be meaningful, discussions " 'must generally lead offerors into the areas of their proposals requiring amplification or correction'") (quoting *SRS Techs.*, 94–2 C.P.D. ¶ 125 at 6 (1994)); *Boeing Sikorsky Aircraft Support*, 97–2 C.P.D. ¶ 91 at 12 (1997). It was thus not given a fair opportunity to correct these deficiencies and submit a technically acceptable amended proposal. *See Boeing Sikorsky*, 97–2 C.P.D. ¶ 91 at 12.

The pervasive nature of the errors here draws into question the entire solicitation. There is no reason to believe other offerors were evaluated in a less arbitrary manner than the parties in this action.[71] An order directing the agency to resume this procurement after the submission of amended proposals would thus harm offerors and provide them with a legitimate basis to protest, which would further delay this procurement. The most equitable remedy, therefore, given the patent and pervasive errors throughout this procurement, is to require a new solicitation.

## VII. Proposal Preparation Costs

Plaintiff seeks recovery of the costs of preparing its various proposals. In the February 12, 1999 Order, the court ruled that plaintiff was entitled to recover proposal preparation costs. The only remaining issue is the quantum of plaintiff's recovery.

Plaintiff submitted an affidavit which stated his proposal costs as $23,439.10.[72] This total included three items: (1) $15,625.00 to reimburse plaintiff for time he personally spent preparing his proposals, calculated based upon an hourly rate of $250; (2) $7,739.10 for the services of Stan Laber, a "contract technical consultant," who helped plaintiff to prepare his proposals; and (3) $75.00 for mailing, telephone, faxing, and copying costs. The only documentation to support plaintiff's claim was his post facto itemization of the hours that he and his consultant spent preparing the proposals.

After the Government expressed its concern that his affidavit contained insufficient detail and documentary support, plaintiff filed a revised affidavit. The revised document, however, merely adds plaintiff's post facto description of the work that he performed on each day. No documentation was submitted to support any of the three elements of his claim.

Defendant opposes plaintiff's claim on the basis that plaintiff has failed to provide sufficient documentation to substantiate his claim in either his initial or revised affidavits. The Government raises several principal objections: (1) plaintiff has failed to provide any documentation in any form to support any of the time entries for Mr. Dubinsky; (2) plaintiff has provided no documentation to substantiate that his compensation rate is $250 per hour; (3) plaintiff has not submitted an invoice prepared by Mr. Laber, nor has plaintiff submitted proof that he reimbursed Mr. Laber for his services; and (4) plaintiff has failed to segregate his claim for mailing, telephone, faxing, and copying costs or to provide any documentation for any of these claimed expenses. Nevertheless, defendant acknowledges that plaintiff incurred proposal preparation costs and offers that $2,000 would be a fair and reasonable estimate of preparation costs.

Having reviewed plaintiff's affidavits and his reply brief, which provided no additional documentation, we conclude that plaintiff has failed to provide the necessary support for

---

**71.** Indeed, Sgt. Vaccarella conceded that he misevaluated the amended proposals of at least two offerors. *See supra* § IV.B.3. In addition, plaintiff itself benefitted from some plainly inappropriate scoring. *See supra* note 64.

**72.** During oral argument on February 11, 1999, plaintiff acknowledged that he had conducted a preliminary calculation of his proposal preparation costs and estimated that they were "probably [in] the $5,000 range or $6,000 range." Tr. at 168.

his claim for proposal costs despite three opportunities to do so. Even if the court were to accept plaintiff's post facto reconstruction of the time he spent preparing his proposals, he has not provided any basis upon which we can determine his hourly compensation rate. Moreover, there is no evidence that plaintiff incurred the claimed costs to procure Mr. Laber's services,[73] and there is no support whatsoever for plaintiff's claim for mailing, telephone, faxing, and copying expenses. We conclude, therefore, that plaintiff has failed to substantiate his claim for proposal preparation costs. Nevertheless, we agree with defendant that $2,000 is a fair and reasonable estimate of plaintiff's legitimate costs. The Government has conceded that plaintiff is entitled to recover this amount. Therefore, we award proposal preparation costs to plaintiff in the amount of $2,000.

### CONCLUSION

For the reasons stated, the Academy's award of the contract to Daktronics was arbitrary and capricious and not in accordance with law. The agency is enjoined from continuing the procurement with Daktronics under solicitation number F05611–98–R–2293. The Clerk is directed in her judgment to include an award of $2,000 as proposal preparation costs.

Since this court's February 12, 1999 Order, the court has learned that the Academy has resolicited the procurement under solicitation number F05611–99–T–0821. *See* Commerce Bus. Daily, Mar. 18, 1999, at 32. This solicitation informs offerors that the procurement is for commercial items and the Commerce Business Daily synopsis was prepared in accordance with the format in FAR 12.6. *See id.* It does not, however, explicitly state: (1) whether the Academy intends to conduct the acquisition as a simplified acquisition under the FAR 13.5 test program; or (2) if the procurement is to be conducted under Part 13, whether the agency will follow provisions of Part 15, and if so, which provisions of Part 15 will be followed. If applicable, one or

both of these announcements are required by this opinion. Accordingly, if the Academy intends to conduct this procurement as a simplified acquisition, it is hereby directed to issue an amendment to the Commerce Business Daily synopsis to inform potential offerors of these essential facts. Costs to plaintiff.

---

**73.** Nor has plaintiff explained why Mr. Laber's services were necessary in preparing his proposals.